**MUSEUM BOUTIQUE INTERCONTINENTAL, LTD., Plaintiff,**

v.

**Claude PICASSO, Paloma Picasso, Maya Picasso, Marina Picasso, Bernard Picasso, Societe De La Propriete Artistique Et Des Dessins Et Modeles, The Pablo Picasso International Licensing Company, Les Grands Classiques, Lucien Lallouz and Charles Lallouz, Defendants.**

**No. 93 Civ. 6119 (SAS).**

United States District Court, S.D. New York.

Feb. 1, 1995.

Hugh C. Hansen, Gerald M. Levine, Calotta Levine Samuel & Schreiber, New York City, for plaintiff Museum Boutique Intercontinental, Ltd. ("MBI").

Dorothy M. Weber, Peter S. Shukat, Shukat Arrow Hafer & Weber, L.L.P., New York City, for defendants Claude Picasso and Societe De La Propriete Artistique Et Des Dessins Et Modeles ("SPADEM").

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

## I. INTRODUCTION

The parties in this action (and many of the parties in two recently filed related actions) have spent a good deal of their time during the last fourteen years litigating against one another. The subject matter of this litigation marathon is the artwork of the late Pablo Picasso, who created more than one hundred thousand works of art prior to his death in 1973. In this action, plaintiff Museum Boutique Intercontinental, Ltd. ("MBI") is suing the heirs of Pablo Picasso (and their agents), seeking damages for copyright infringement and unfair trade practices as well as for a declaratory judgment and preliminary and permanent injunctive relief.

This action was originally filed in late August, 1993 in New York State Supreme Court. It was then removed to this Court by defendants. On or about September 10, 1993, the parties entered into a Standstill Stipulation ("Standstill") in lieu of MBI proceeding with its motion for preliminary injunctive relief. For the next year the parties attempted to settle the action while continuing to do business in accordance with the terms of the Standstill. In October, 1994, plaintiff alleged that defendants had violated the terms of the Standstill. This spelled the end of the settlement discussions and of the unexpectedly lengthy period of wary coexistence.

In November, 1994, defendants brought a motion for a preliminary injunction and moved to vacate the Standstill. Plaintiff countered by also moving for a preliminary injunction or, in the alternative, a finding that the defendants had violated the Standstill. In addition to extensive briefing, oral argument on the motions was held on December 30, 1994. Postargument submissions were also received. These three motions are now pending before this Court.

## II. FACTUAL BACKGROUND

### A. *The Parties*

MBI creates and licenses artistic designs incorporating images from famous works of art, including those by Pablo Picasso. These

designs are used on many types of merchandise, ranging from neckties to underwear. It has created a distribution network for the manufacture, license, and sale of its works which are sold through museum shops, department stores and mail-order catalogues. Marilyn Goldberg is the President of MBI. In 1980, Ms. Goldberg opened her first company, Marigold Enterprises, a predecessor to MBI. Ms. Goldberg asserts that she has marketed Picasso works for the past fourteen years. *See* Affidavit of Marilyn Goldberg dated December 19, 1994 ("Goldberg Affidavit") at ¶ 4.

The heirs of Pablo Picasso consist of his children and grandchildren, including Claude, Paloma, Maya, Marina and Bernard Picasso. Claude Picasso is the administrator of the Picasso Estate, also known as the Succession Picasso. In that capacity, he is authorized to act on behalf of all of the Picasso heirs.

The Societe de la Propriete Artistique et des Dessins Et Modeles ("SPADEM") (now known as the Societe des Auteurs des Arts Visuels), is a French organization engaged in the business of protecting the intellectual property rights of individual artists on a worldwide basis. The Succession Picasso is a member of SPADEM. In 1976, SPADEM and the heirs entered into an agreement by which SPADEM was granted the right to administer, manage and exploit the Picasso name, image and likeness in connection with reproductions of Picasso artwork. *See* Complaint, *SPADEM v. Finesod, et al.*, 95 Civ. 0102, at ¶ 19.[1] SPADEM has the right to grant licenses for the exploitation of Picasso artwork.[2]

### B. *The Remaining Cast of Characters*

In order to fully understand the various complaints and motions, as well as the history of the relevant licensing agreements, it is necessary to set forth a brief description of each of the entities and individuals who play a role, whether major of minor, in this history. An attempt is made to identify these players in somewhat of a chronological order:

—Talent Network, Inc. ("TNI") is a Chicago based licensing organization. In or about 1976, SPADEM entered into a license agreement with TNI. Pursuant to that agreement, TNI created a line of eyewear, fabrics and wall coverings utilizing reproductions of Picasso artwork, together with the Picasso signature.

—Paraselenes S.A. is a Swiss corporation representing Marina Picasso. In 1979, Paraselenes granted certain rights to Art Masters International ("AMI") to exploit a group of paintings known as the Marina Picasso collection. This lawsuit concerns the Marina Picasso collection.

—AMI, a Delaware corporation, was in the business of purchasing the copyrights of artistic works for use in reproductions, products and merchandise. AMI purchased only the rights in the artwork, not the tangible works of art.

—The Paraselenes Agreement was entered into on December 6, 1979. By the terms of this Agreement, Marina Picasso agreed to sell to AMI the *option* to buy photoscreen negatives of more than 1,000 Picasso paintings, the reproduction rights in those works, the accompanying global copyrights, and the exclusive license to use, control, manufacture and sell the works produced. *See* Paraselenes Agreement, Attached as Exhibit D to Defendants' Statement of Facts at ¶ 6. In return, Marina Picasso was to receive annual guaranteed payments, including 60% of the gross receipts received by AMI from any third party which bought and marketed a painting. *Id.* at ¶¶ 9–10. All payments due from AMI were secured by a security interest that Paraselenes retained in the copyrights that were sold to AMI. *Id.* In addition, the contract had a fifteen year term which expired in December, 1994.

The Agreement also provided that AMI would presell any photoscreen negatives and the accompanying copyrights to third party investors and would retain a security interest in this property. *Id.* at ¶ 10. The investors

---

1. As discussed below, SPADEM has filed a separate suit against MBI and other defendants. That suit (95 Civ. 0102) is treated as a counterclaim in the present case.

2. For convenience, SPADEM will be used to designate all of the defendants in this action.

were to pay AMI 50% of the revenues received from exploiting the images. *Id.* Finally, AMI and its successors or assigns were contractually obligated to respect the Estate's *droit moral,* or moral rights, as that term is defined by French law. *Id.* at ¶¶ 7(j), 12, 19(e).[3] The Agreement also states that "buyer agrees that in no event will the reproduction master or the images be used on any item or in any way that would denigrate the name, honor, reputation or memory of Pablo Picasso as provided in the *droit moral.*" *Id.* at ¶ 12.

Pursuant to this Agreement, AMI purchased 109 works from Marina Picasso which were subsequently sold to third party investors ("First Investors"). The First Investors invested in the works primarily as a tax shelter. In early 1980, Marigold Enterprises (MBI's predecessor) began contracting with the third party investors to market their Picasso images.

—Jackie Fine Arts ("JFA") is the successor in interest to AMI. Herman Finesod is the owner and president of JFA.

—VAGA and 1980 VAGA Agreement. In 1980, the Picasso Estate sued JFA in New York Supreme Court in an attempt to force JFA to produce the names of the investors who had purchased the works sold to JFA under the Paraselenes Agreement. JFA and AMI then sued the heirs and SPADEM to establish the rights of the parties in the images and associated copyrights. The Picasso Estate then sued AMI, JFA and Marigold Enterprises in this Court for, *inter alia,* the ownership of the copyrights to the 109 works and the enforcement of the moral rights in the works. On October 28, 1980, these lawsuits were settled pursuant to an agreement between Visual Artists and Galleries Association, Inc. ("VAGA"), SPADEM's U.S. agent, and AMI and JFA ("1980 VAGA Agreement"). By this agreement VAGA (which had acquired all of the works in the Marina Picasso collection) granted to AMI an exclusive option to acquire or reproduce, sell or manufacture an additional 391 images and the associated copyrights. *See*

1980 VAGA Agreement, Attached as Exhibit E to Defendants' Statement of Facts. In return, VAGA received a *minimum* guaranteed annual payment totaling over ten million dollars (to be paid over a thirteen year period), a fee of $10,000 for each unit actually purchased, and a deferred obligation in the amount of $270,000, which was to be paid from revenues received by AMI from third party investors. *Id.* at ¶¶ V–VI. The VAGA Agreement also reaffirmed the Paraselenes contract and AMI's right to the 109 images purchased pursuant to that Agreement. *Id.* at ¶ VII.

The VAGA Agreement provides VAGA with a security interest in the long term notes given by third party investors to AMI or JFA in order to enable VAGA to collect 60% of the revenue received by AMI from the investors. *Id.* at ¶ XI and Attachment B. VAGA also received a security interest in the images and copyrights to protect against a default by AMI on its obligations to VAGA. *Id.*

In addition, the VAGA Agreement provides for a stringent approval process regarding moral rights. The Agreement specifically provides that "[t]he parties to this Agreement *and their assigns* are bound by the following provisions [regarding approvals]." *Id.* at Attachment A (emphasis added). These provisions dictate that a committee comprised of Maya, Paloma, Marina, Bernard, and Claude Picasso will decide whether any reproduction of a Picasso image conforms to the *droit moral,* as applicable to the work in question. *Id.* Certain products—including prints, posters, and greeting and note cards—were approved types of uses in all cases. In case of dispute, an expert designated by mutual agreement of the parties would review the committee's conclusions and determine if the reproduction violated the *droit moral. Id.* In addition, AMI agreed to use its best efforts to make the First Investors, who had purchased the 109

---

**3.** *Droit moral,* or moral right, is generally summarized as including the right of an artist to have his work attributed to him in the form in which he created it to prevent mutilation or deformation of the work. *See Gilliam·v. ABC,* 538 F.2d 14, 24 (2d Cir.1976).

Paraselenes images from AMI, accept this approval process. *Id.* at ¶ VII(b).[4]

JFA then purchased 125 works from the Marina Picasso collection which were subsequently sold to third party investors. ("Second Investors"). Thus, a total of 234 (109 + 125) works were bought by AMI/JFA pursuant to the 1979 Paraselenes and 1980 VAGA agreements. MBI and its predecessor companies received exclusive licenses from a number of both the first and second investors to market, produce, and license reproductions of these works. These licenses purported to make MBI the exclusive owner of the copyrights associated with the individual images. These licenses began in 1980 and continue through January, 1995.[5]

—1983 Amended VAGA Agreement. In 1983, AMI and JFA assigned and transferred to VAGA their "interests in all security interests" that either of them had in the images and copyrights obtained under the 1979 Paraselenes or 1980 VAGA Agreement "to the extent required to enable VAGA to collect on [the investors long-term] obligations." *See* 1983 VAGA Agreement, Attached as Exhibit K to Defendants' Statement of Facts at ¶ IV. In return, VAGA was to return 30% of any monies collected to JFA and/or AMI. All of the long term notes given by the First and Second Investors became due in June, 1994 or January, 1995. While the 1983 Amended VAGA Agreement changed the manner in which JFA was to pay for the images and modified the amount to be paid, it expressly stated that none of the original agreements were cancelled. *Id.* at ¶ VI.

—Artists Rights Society, Inc. ("ARS"), is a New York corporation which in 1988 replaced VAGA as SPADEM's U.S. agent. It, in turn,

was replaced in 1993 by Picasso International Licensing Company ("PPIL").

—Worldco Services Group, Inc. ("Worldco") is a Delaware corporation controlled by Herman Finesod, the president of JFA. In or about December, 1992, JFA assigned its interest in 173 (of the 234 Marina Picasso images) images to Worldco. JFA allegedly received its interest in the 173 images from transfers or reassignments back from the First or Second Investors.

—Diversified Investors Services of North America, Inc. ("Diversified") is a Delaware corporation also controlled by Finesod. In December, 1992, Worldco transferred its interest in the 173 images to Diversified.

—Jake Berg operates Diversified. On June 1, 1994, Jake Berg granted MBI the exclusive right to exploit the 173 images (the "173 Jake Berg images"). According to Finesod, however, this transaction merely confirmed a previous oral arrangement made with Marilyn Goldberg. Finesod alleges that he had told Goldberg since 1986 that she could have exclusive licenses for any images which reverted back or were assigned to JFA. *See* Affidavit of Herman Finesod dated December 15, 1994 ("Finesod Affidavit") at ¶ 9.

—Paul and Penny Ross and Phyllis Faircloth were three of the investors who purchased images from JFA. The Ross's and Ms. Faircloth separately sued JFA and Herman Finesod, as well as Marilyn Goldberg and MBI, in federal court in South Carolina after the IRS disallowed the use of the art investment program as a tax shelter. In the Faircloth case, the jury found that Finesod had defrauded Ms. Faircloth in a massive tax fraud scheme.[6] Finesod and JFA were en-

---

**4.** AMI assigned all of its rights in the 1979 Paraselenes and 1980 VAGA agreements to JFA. In November, 1994, VAGA assigned all of its rights in the VAGA Agreement to SPADEM.

**5.** Most of these licenses explicitly state that MBI must obtain approvals from the individual investor-licensors before marketing products incorporating the investor's image. *See* Plaintiff's Supplemental Exhibits, Vol. I(a), I(b). As noted above, the approval provisions of the 1979 Paraselenes Agreement and 1980 VAGA agreements purport to bind the investors, as assigns of JFA, to the approval requirements stated in those con-

tracts. SPADEM claims that MBI, as agent for the investors, is thus bound by the obligations of those contracts as well. *See* Defendants' Statement of Facts at ¶¶ 9–10.

**6.** The jury found against Finesod—after he failed to appear—on fraud, conspiracy and RICO charges. *Faircloth v. Herman Finesod, et al.* (CA–85–1854–2–1 D.SC.1985). The Fourth Circuit later reversed the fraud and conspiracy convictions on technical grounds. *See Faircloth v. Herman Finesod, et al.,* 938 F.2d 513 (4th Cir. 1991).

joined, together with any of their heirs or assigns, from ever collecting on the promissory notes given by Ms. Faircloth, and punitive damages of over $1.4 million were assessed. In the later Ross case, judgments— which remain unpaid—were entered against Finesod for over nine million dollars and against JFA for over five million dollars. *See Ross v. Jackie Fine Arts, et al.,* 1991 WL 213815, 1991 U.S. Dist. Lexis 13535 (D.S.C. Sept. 4, 1991).

—The Proposed Global Licensing Agreement. In or about April, 1992, MBI and SPADEM commenced negotiations on a Global License Agreement, which was *never signed.* The parties have different views as to the purpose of this agreement. According to SPADEM, this negotiation was an attempt to settle the disputes over pre-approval of reproductions and copyright, trademark and moral rights issues. *See* Defendants' Statement of Facts at ¶ 13. MBI, in turn, alleges that the agreement contemplated a grant of rights in additional works, an expedited approval process, and the use of a distinctive mark identifying MBI's products as approved by the Picasso heirs. *See* Complaint, ¶¶ 55–69.

### C. *The Claims in the Instant Lawsuit*

On May 26, 1994, nine months after the parties signed the Standstill, MBI served an Amended Complaint. In its eleven-count Complaint (Counts 3 and 8 have been withdrawn) MBI seeks (i) a declaratory judgment that defendants have infringed its *exclusive rights in the investor owned works,* for which MBI claims it has exclusive licenses, and a permanent injunction barring defendants from making any use of such works; and (ii) a declaratory judgment that defendants' actions infringe MBI's copyrights in MBI derivative works and a permanent injunction barring defendants from making any use of such works.

The Amended Complaint also alleges that defendants have engaged in (i) false designations of origin by using MBI derivative works, MBI promotional material and the Picasso signature allegedly designed and used by MBI; (ii) trade secret misappropriation by using MBI's lists of manufacturers, distributors, licensees, and customers; (iii) conduct constituting promissory estoppel in that SPADEM promised to sign the Global License Agreement and that MBI relied on such promises; (iv) intentional interference with contractual relations by interfering with MBI's contractual and business relations with its manufacturers, distributors and agents in Japan; (v) breach of contract— namely the 1980 and 1983 VAGA Agreements; (vi) unjust enrichment by obtaining payments from MBI through threats to withhold moral rights approvals, by disrupting MBI's business and by granting the rights to others to manufacture and distribute designs and concepts created by MBI; (vii) deceptive acts and practices and false advertising by producing, licensing, distributing and selling derivative works based on Picasso works for which MBI has the exclusive licenses; (viii) common law unfair competition by creating confusion as to the source and origin of certain products; and (ix) defamation and disparagement by making libelous and slanderous statements and representations to third parties concerning MBI's rights to Picasso images.

Defendants counterclaimed against MBI by the filing of a separate action on January 6, 1995. Defendants in that action include MBI as well as Finesod, JFA, AMI, Worldco, Diversified, Jake Berg, and Marilyn Goldberg.[7] In their six-count complaint and counterclaim, defendants seek (i) to enjoin MBI and the additional defendants from making any further use of the copyrights that were assigned or transferred under the Paraselenes and 1980 VAGA Agreements because of AMI and JFA's failure to pay for the images associated with these copyrights, (ii) an accounting of all income and profits derived from the use of those images and (iii) the return of those images. Defendants also seek equitable replevin of the copyrights. Defendants also assert irreparable harm resulting from MBI and the other defendants' (i) violation of the *droit moral* and (ii) breach

---

7. *SPADEM v. Herman Finesod, et al.,* 95 Civ. 0102. Although no answer has yet been filed in MBI's (93 Civ. 6119) action, the Court is treating SPADEM's suit (95 Civ. 0102) as a counterclaim against MBI.

of contract with respect to pre-approval. Finally, defendants assert that they have suffered damages in an amount not less than $10 million as a result of MBI and the other defendants' (i) tortious interference with their reasonable expectation of economic advantage flowing from the Paraselenes and VAGA Agreements; and (ii) unjust enrichment by reason of their fraudulent conduct, misrepresentations and conversion.

In short, the underlying issue in this litigation is the ownership of the copyrights in the 234 Marina Picasso images and the accompanying rights to exploit those images.

### D. *The Standstill Stipulation*

In lieu of proceeding on MBI's motion for a preliminary injunction, the parties negotiated a Standstill Stipulation on September 10, 1993. In its "Whereas" clauses the Standstill states that the parties "are desirous of maintaining the status quo pending settlement or judicial determination of the issues herein" and that "each of the parties hereto claims valid rights to license, manufacture, or sell commercial products or sell prints containing images created by Pablo Picasso and are currently doing so." The parties then stipulated to certain terms including, *inter alia,* the following two (emphases added):

1. Each of the parties shall continue to license, manufacture or sell commercial products and/or sell prints containing images created by Pablo Picasso *in the custom and manner* in which they were doing so prior to the date of this Stipulation.
2. None of the parties hereto, pending settlement or judicial resolution *shall state or imply to third parties that the opposing party or parties do not have valid rights to license, manufacture, or sell the prints or products containing images created by Pablo Picasso.*

On October 28, 1994, Dorothy Weber, counsel for SPADEM, wrote a letter to a number of MBI licensees and stated that they were required to obtain SPADEM's approval before reproducing and marketing any Picasso images. At a November 1, 1994 hearing, Judge Cedarbaum found that this letter violated the Standstill and ordered Ms. Weber to cease any further contact with MBI licensees and to disclose the names of the licensees already contacted through these letters. *See* Transcript of Hearing ("Transcript"), November 1, 1994 at 30–33.

### E. *The Subsequent Lawsuits*

On December 5, 1994, SPADEM and the Picasso heirs sued King Features, Inc., Spiegel Neckwear, Accessory Network and Cafe Picasso. *See SPADEM, et al. v. King Features Syndicate, Inc., et al.,* 94 Civ. 8781 ("*King Features* case"). King Features is MBI's U.S. Agent as well as an MBI licensee and licensee distributor. This action is part of a series of actions commenced by SPADEM in federal courts in Florida, New York and California.

In that case, SPADEM alleges that the defendants violated § 43(a) of the Lanham Act by offering to the public products and services (including video games and multimedia software) which feature Picasso images, Picasso's name and his signature (collectively, the "Picasso trademarks"). SPADEM alleges that the defendants' use of these trademarks—which have been used by SPADEM to license products since 1977—constitutes a false designation of origin and a false or misleading description of fact which is likely to cause confusion and mistake as to the origin or approval of defendants' products. SPADEM further claims that defendants' products are likely to be confused with authentic reproductions of Picasso artwork, and that defendants have no license or right from SPADEM to use the Picasso trademarks in conjunction with the sale of their products.

### III. DISCUSSION

### A. *Defendants' Motion to Vacate the Standstill Stipulation*

SPADEM first seeks an order, pursuant to Fed.R.Civ.P. 60(b)(5), vacating the Standstill entered into by the parties on September 10, 1993. The Standstill is most akin to a formal preliminary injunction decree maintaining the status quo and both parties' counsel agree that the Standstill substituted for a preliminary injunction. *See* Defendants' Reply Memorandum of Law at 9; Plaintiff's Memorandum of Law at 4.

█ A preliminary injunction is an equitable remedy issued under established principles which guide courts of equity and is meant to maintain the status quo until there can be a hearing on the merits. *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir.1984), *cert. denied*, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986). A motion for a preliminary injunction is addressed to the discretion of the trial court which decides such motions on traditional equitable grounds. *Id.* at 257. A trial court's power to modify an injunction, like the power over all its orders, is inherent. *Id.* at 256. In this Circuit, when modifying or vacating a preliminary injunction, a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place. *Id.* at 256; *see also* 11 Wright & Miller § 2961, at 6000 ("wide discretion") (quoting *System Fed'n No. 91 v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)). Thus, a district court may modify or vacate a preliminary injunction when, based on principles of equity, the modification is necessary to preserve the status quo. *Sierra Club*, 732 F.2d at 257.[8]

█ SPADEM argues that there has been a substantial departure from the status quo which existed at the time the Standstill was signed in September, 1993. First, SPADEM alleges that, at the time of the Stipulation, MBI had six or seven license agreements to reproduce no more than thirty images in approximately twelve different product categories, consisting mostly of high-end "boutique" items like porcelain trays, silk scarves and handkerchiefs. SPADEM further alleges that MBI subsequently entered into over fifty licenses to reproduce its Picasso images on "low end" product lines like men's underwear and baby bibs. Second, SPADEM claims that on June 1, 1994, MBI acquired

rights in and to approximately 173 JFA images (the "Jake Berg images"), a transaction which SPADEM alleges greatly changed the scope of the licensing programs envisioned when the Standstill was signed.

The Court first notes that the Standstill is not an unambiguous document: although it provides that the parties shall continue to license and manufacture in the "custom and manner" in which they were doing so at the date of the Standstill, that phrase is not defined within the four corners of the document and little guidance is given as to what was envisioned. However, it is clear that the Standstill was meant as a temporary measure to maintain the status quo pending expedited discovery and a full trial on the merits. It was not meant as a long term solution to the parties' multi-year disagreements over copyright, contract, trademark, *droit moral*, and pre-approval issues. *See* Transcript, Nov. 1, 1994 at 21; *see also* Letter from Ken Umans, SPADEM's former attorney who signed the Standstill Stipulation, dated July 20, 1994 (Attached as Exhibit A to Reply Affidavit of Peter Shukat), stating that the Standstill was only intended to last for a "short duration." The Court analyzes the changes to the status quo since September, 1993 with this perspective in mind.

After having considered the affidavits and supplemental exhibits submitted by the parties, the Court finds that the present circumstances are significantly different than those which existed when the Standstill was signed in September, 1993. While it is unclear if MBI, as SPADEM claims, had only six or seven license agreements and the right to reproduce thirty images in September, 1993, the Court did order MBI to produce copies of all current license agreements. MBI's supplemental exhibits produced in response to this order indicate that at the time of the

---

8. By contrast, different standards apply when a court is asked to modify a permanent or final injunction. *See, e.g., United States v. Swift*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (holding that a court may modify a final or permanent injunction only after a clear showing of grievous wrong evoked by new and unforeseen conditions); *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (holding that in the context of institutional reform litigation any showing of a signifi-

cant change in factual conditions or law would justify a modification of an equitable consent decree); *Patterson v. Newspaper & Mail Deliverers' Union*, 13 F.3d 33, 38 (2d Cir.1993), *cert. denied* — U.S. ——, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994) (applying *Rufo* flexible standard to situations in which "a decree seeks pervasive change in long established practices affecting a large number of people, and the changes are sought to vindicate rights of a public nature").

Standstill, MBI had 20 direct license agreements with the investors. *See* Supplemental Exhibits, Vol. I(A), I(B). Currently, MBI has 71 direct license agreements for over 200 images, most of which were entered into during 1994. Indeed, some of the license agreements are as recent as January, 1995. *Id.* Thus, most of MBI's current license agreements were entered into after the date of the Standstill.[9]

In addition, MBI also claims the copyrights in the 173 images on the Jake Berg list.[10] SPADEM claims that MBI obtained the rights to these 173 images on June 1, 1994 from Diversified, substantially expanding the scope of its licensing activities. MBI, however, claims that Herman Finesod, the president of JFA, had told Marilyn Goldberg since 1986 that she would receive exclusive licenses for the copyrights in any investor-owned images that were assigned back to JFA or which reverted back to JFA after an investor defaulted upon the promissory notes given to JFA for the images. Ms. Goldberg claims that the June 1, 1994 agreement with Diversified merely formalized these prior oral licenses with Finesod and that MBI thus had a right to exploit the Berg images before the date of the Standstill. *See* Affidavit of Marilyn Goldberg at ¶ 20.

■ Under the statute of frauds provision of the Copyright Act, a transfer of copyright ownership "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed." *See* 17 U.S.C.A. § 204(a) (1977 & Supp.1994). However, a writing which memorializes an oral license does not need to be entered into at the time when the license was initiated; a later execution of a writing confirming the oral agreement is sufficient to satisfy the statute. *See Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.1982). Thus, Marilyn Goldberg's assertion that she had a previous oral arrangement with Finesod by which he gave her a license to all the Berg images, taken alone, might be sufficient to satisfy the statute of frauds provision of the copyright statute.[11] However, at this juncture the Court is not willing to make any findings as to what images and associated copyrights Finesod and JFA owned in 1986 at the time of the alleged oral licenses.[12] What the Court does find is that many of the licenses submitted by MBI relate to images on the Berg list and were entered into during 1994. Thus, MBI's licensing activity has clearly increased significantly since September, 1993.

It is true, as MBI argues, that the Standstill does not contemplate that the parties are to cease competing and seeking new business opportunities. For example, ¶ 3 of the Standstill provides, that in the event the parties

---

9. MBI also cites to an April 11, 1988 letter from JFA which states that an unspecified number of individual investors have "confirmed *their desire* to renew old agreements or allow exclusive arrangements" with MBI. *See* MBI's Supplemental Exhibits, Vol. 1(A) index (emphasis added). The only licenses considered by the Court, however, are the 71 current licenses submitted by MBI.

10. Many of the Berg images are included in the 71 direct license agreements submitted by MBI.

11. MBI's only proof of this prior oral agreement are the statements of Goldberg and Finesod and copies of two checks from MBI to Diversified, dated July 23, 1993 and August 18, 1993, in the amounts of $4,200 and $10,000, respectively. *See* Exhibit 3 attached to Affidavit of Hugh Hansen, attorney for MBI, dated December 15, 1994. The Court finds the proof of this alleged oral agreement very dubious. First, Finesod's credibility is very suspect, given that a federal court in South Carolina found that the JFA Picasso investment program was part of a massive tax fraud scheme administered by Finesod. *See supra* page 158. Moreover, Finesod's transfer of the 173 Berg images to Worldco and then to Diversified in 1992 undercuts his claim both that he had the right to those images and transferred those rights to MBI in 1986. Finally, the checks submitted by MBI, which do not contain any explanatory notations besides "Picasso royalties," are not convincing proof, to say the least, of the alleged oral agreement.

12. It is unclear if JFA and Herman Finesod ever validly obtained the rights to the Berg images before allegedly transferring the images (through Worldco and Diversified) to Ms. Goldberg and MBI on June 1, 1994. Indeed, there is considerable doubt, given the 1980 and 1983 VAGA agreements, as to whether JFA and MBI are entitled to the Berg images and associated copyrights. This is an additional reason to vacate the Standstill, since it was never meant to address the future rights of the parties.

wind up competing for licensing opportunities, the parties may not disparage or discuss the opposing side. Obviously, it is impossible to compete for licensing opportunities without one side expanding its business. However, this does not change the fact that the Standstill, as a short term stopgap, was not intended to govern indefinitely the future relations of the parties or adjudicate their rights with respect to the Picasso images.

SPADEM also claims that MBI significantly changed the nature of its licensing business after the Standstill to include low-end product categories like men's underwear and baby bibs. While the Court is not prepared to determine if there has been a significant increase in low-end products marketed by MBI since September, 1993, the Court finds that MBI has not attempted to obtain SPADEM's pre-approval for any products as required by the 1980 VAGA Agreement or attempted to comply with the *droit moral,* as required by both the 1979 Paraselenes and 1980 VAGA Agreements. As discussed above, these agreements require JFA and its *successors or assigns* to comply with pre-approval requirements (1980 VAGA Agreement) and to respect the Estate's moral rights (1979 and 1980 Agreements). MBI appears to be bound by these provisions, given that it derives its rights to the images from the investors who purchased the images from JFA. Indeed, some of the licenses given to MBI by the investors require *MBI* to advise the investors that *"approvals must be obtained and investors must cooperate on these approvals or they will be liable for litigation from the Picasso family."* See, e.g., MBI's Supplemental Exhibits, Vol. I(A) (Investor James C. David Licensing Agreement); Vol. I(B) (Investor Arnold C. Ramberg Licensing Agreement).[13] The investors, as assignees of JFA, also appear bound by the pre-approval and *droit moral* requirements of the 1979 Paraselenes and 1980 VAGA Agreements. While the Court declines to adjudicate fully the underlying con-tract rights at this time, it is very clear at the least that the Standstill has outlived its usefulness given that pre-approval and *droit moral* issues have brought the parties to loggerheads.

Therefore, because the status quo has changed since September, 1993 and because the Standstill was not meant to govern the activities of the parties for a lengthy period of time, the Court vacates the Standstill. In accordance with its equitable powers, the Court issues in place of the Standstill an Order which requires a pre-approval process similar to the one set out in Attachment A to the 1980 VAGA Agreement and which requires respect for the Estate's moral rights which are recognized in both the 1979 Paraselenes and 1980 VAGA Agreements. The purpose of this Order is to enable the parties to coexist until the merits of the case can be resolved after expedited discovery and trial.[14]

### B. *Defendants' Motion for a Preliminary Injunction*

SPADEM has also moved, pursuant to Fed.R.Civ.P. 65, to enjoin MBI from exercising any control over or exploiting the 173 Jake Berg images. For the reasons that follow, the Court denies this motion.

In order to obtain a preliminary injunction in this Circuit, the applicant must demonstrate irreparable harm, and either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in its favor. *Polymer Technology Corp. v. Mimran,* 37 F.3d 74 (2d Cir.1994) (citing *Coca–Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 314–15 (2d Cir. 1982). Irreparable injury means "injury for which a monetary award cannot be adequate compensation." *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917 (2d Cir.1986) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). Likewise, "where

---

13. These licenses also state that the investor understands "that MBI will be reporting to me [the investor], as well as to the Picasso family, with regard to all approvals of designs and sales territories." *See* MBI's Supplemental Exhibits, Vol. I(A) (James C. David Licensing Agreement).

14. The Standstill Order referred to is attached as Exhibit A to this opinion.

money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). Since a preliminary injunction is an extraordinary remedy which should not be granted as a routine matter, a party seeking such relief must show a *likelihood* of irreparable injury, not a *possibility* of irreparable injury, and "likelihood sets, of course, a higher standard than possibility." *Id.* at 79–80.

SPADEM claims that it will be irreparably injured if MBI is not enjoined from exercising any control over the Berg images for two reasons. First, it claims that MBI, by acquiring the Berg images on June 1, 1994 and subsequently sublicensing them to various entities, has infringed SPADEM's trademark rights. These trademarks include the Picasso images, Picasso's name, and his distinctive signature (collectively, the "Picasso trademarks").[15] Second, it asserts that it will be irreparably harmed because it will be forced to deal with moral rights claims against a body of over 200 images. The Court rejects both of these claims.

In this Circuit, irreparable harm is usually presumed when the use of a trademark or copyright creates a likelihood of confusion in the consumer's mind as to the ownership or sponsorship of a product. *Church of Scientology Intern. v. Elmira Mission*, 794 F.2d 38 (2d Cir.1986) ("[E]stablishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985) (trademark infringement creates a presumption of irreparable harm); *see also Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.*, 25 F.3d 119 (2d Cir.1994) (holding that irreparable harm is presumed when a copyright is infringed because of the confusion created in the marketplace). However, preliminary injunctions are normally granted under the theory that there is an urgent need for speedy action to preserve a party's rights; delay in seeking enforcement of those rights tends to indicate at least a reduced need for such drastic, speedy action. *Citibank, N.A. v. Citytrust*, 756 F.2d at 276. "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir.1985) (per curiam), citing *Citibank, N.A.*, 756 F.2d at 276.

Assuming for the purposes of this motion that the Picasso trademarks are valid, SPADEM's actions and the history of this litigation belie its claim of irreparable injury. MBI or its predecessors have been marketing and licensing Picasso images since at least 1980, and Marilyn Goldberg has stated that she chose the distinctive Picasso signature for VAGA, SPADEM's former U.S. agent. Goldberg Affidavit at ¶ 16; *but see* Affidavit of Claude Picasso dated November 24, 1994 in support of Defendants' Motion to Dismiss at ¶¶ 12–13 (stating that the Picasso trademarks were created and have been used by the Estate since 1977).[16] Ms. Goldberg also stated that she has used this signature on MBI's products for that time period. *Id.* MBI's supplemental exhibits contain examples of reproductions of Picasso images with the Picasso name and signature printed on products like silk scarves, socks, and posters which have been marketed since the 1980's. *See* MBI's Supplemental Exhibits Vol. 3. Thus, it appears that SPADEM has been aware of MBI's (or its licensees') use of the allegedly infringing trademarks for up to fourteen years.[17]

---

**15.** At oral argument, SPADEM also alleged that it would be irreparably harmed because its copyright interests—to the extent it could establish its entitlement to the 173 Berg images and associated copyrights—would also be infringed. *See* Transcript of Preliminary Injunction Hearing ("Hearing Transcript"), December 30, 1994 at 44.

**16.** Claude Picasso's affidavit was submitted in conjunction with defendants' Motion to Dismiss the Complaint, which is now pending before the Court.

**17.** In a Supplemental affidavit, Dorothy Weber, MBI's counsel, acknowledges that some of MBI's marketing brochures used by MBI in the 1980–1994 period expressly state that the products are either "authorized by an heir of Pablo Picasso"

More importantly, the parties have been involved in disputes, litigation and settlement talks for the past fourteen years over the various contract, copyright, trademark, and *droit moral* issues discussed at the beginning of this opinion. SPADEM cannot now claim that MBI's acquisition of the Berg images has suddenly caused it irreparable harm, given that it has continuously attempted to resolve any trademark issues stemming from MBI's licensing activity. For example, in April, 1992, the parties attempted to settle some of their disputes by negotiating (but never signing) a Global License Agreement. This Agreement, *according to SPADEM*, was an attempt to settle disputes over moral rights, trademark rights, and the contractual and approval process. *See* Defendants' Statement of Facts at ¶ 13. Thus, SPADEM has explicitly acknowledged it was aware of MBI's allegedly infringing activity and chose not to move for a preliminary injunction at that time. *See Tommy Hilfiger, U.S.A., Inc. v. Siegfried & Parzifal, Inc.,* 1994 WL 86398, 1994 U.S. Dist. Lexis 2966 (S.D.N.Y. March 16, 1994) (denying plaintiff's motion for a preliminary injunction based on trademark infringement after plaintiffs delayed bringing suit for as much as three years); *Citibank, N.A. v. Citytrust,* 756 F.2d at 276 (finding that even a ten week delay from discovery of alleged copyright infringement to commencement of the lawsuit destroyed any presumption of irreparable harm).

A very instructive case is *Gear, Inc. v. L.A. Gear California, Inc.,* 637 F.Supp. 1323 (S.D.N.Y.1986), in which the Court denied the plaintiff's motion for a preliminary injunction because it found the plaintiff was dilatory in seeking equitable relief to protect its "L.A. Gear" trademarks. Specifically, the Court found that the plaintiff was on notice that the defendants were aggressively marketing and developing a range of products that could, and at times did, infringe on plaintiff's trademarks. When defendants began a new infringing use, plaintiff sought a preliminary injunction. Judge Haight denied the request, ruling that:

> In these circumstances, defendant's continued expansion into new activities cannot be considered a qualitative change. Plaintiff was on notice a year before it filed suit and more than a year before seeking preliminary relief that defendant intended to continue to use "L.A. Gear" on various product lines, including one directly competitive with a "Gear" line; that defendants were seeking to register the "L.A. Gear" mark; and that defendants denied plaintiff's claim of infringement. It is too late in the day for plaintiff now to claim irreparable injury.

*Id.* at 1332–33.

Similarly, it appears that SPADEM really objects to the *quantitative,* not *qualitative,* change in MBI's licensing activity which occurred after the entry of the Standstill. In the ensuing fifteen months, it appears that MBI has significantly increased its licensing activity. However, SPADEM did not move for a preliminary injunction until November, 1994. This delay negates SPADEM's claim of irreparable harm, especially given that MBI's previous use of the Picasso trademarks and images is not qualitatively different than its exploitation of the Berg images over the past five months. *See Bourne Co. v. Tower Records, Inc.,* 976 F.2d 99 (2d Cir. 1992) (holding that there is no presumption of irreparable harm arising from copyright infringement unless the harm stemming from the later use of the copyright is qualitatively different from the prior harm so as to be unforeseeable).

SPADEM also claims it will be irreparably harmed because it will "be forced to deal with moral rights claims against a body of almost two hundred Picasso images." *See* Defendants' Memorandum of Law at 10. However, SPADEM has failed to demonstrate irreparable harm on this basis for the same reasons as those stated above: it has been aware of and attempted to resolve al-

or are "estate approved." *See* Supplemental Affidavit of Dorothy Weber dated January 10, 1995 ("Weber Supp. Affidavit") at ¶ 6. For example, a brochure promoting silk scarves with embroidered Picasso images contains the Picasso signature and states that the images were "taken directly from estate approved transparencies of the Picasso originals." *See* MBI's Supplemental Exhibits, Vol. 3 No. 1.

leged moral rights violations since 1980 and only now seeks a preliminary injunction. A mere increase in the quantity of moral rights claims does not establish irreparable harm. *Gear, Inc. v. L.A. Gear California, Inc.*, 637 F.Supp. at 1332.

Since the Court finds that SPADEM has not demonstrated irreparable injury, its motion for a preliminary injunction is denied. The Court does note that SPADEM has presented substantial and often compelling evidence on the underlying contract and copyright issues in the case. Indeed, the Court acknowledges that SPADEM may very well be entitled to the 173 Berg images and associated copyrights pursuant to the 1980 and 1983 agreements between JFA and SPADEM. However, because a showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the Court will not further address these underlying issues at this time. *See Reuters, Ltd. v. United Press International, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (a party moving for injunctive relief must first demonstrate that irreparable injury is likely before the other requirements for the issuance of the injunction will be considered).

### C. *Plaintiff's Cross–Motion for a Preliminary Injunction*

■ MBI has cross-moved for a preliminary injunction enjoining SPADEM from prosecuting the *King Features* case, or in the alternative, for a finding that this suit violates the Standstill.[18] As discussed above, that case involves claims by SPADEM under § 43(a) of the Lanham Trade–Mark Act, as amended, 15 U.S.C.A. § 1125(a), against several defendants, at least one of whom is an MBI-licensee and licensee distributor. MBI claims that the institution of that litigation violates the Standstill because it constitutes an interference with its business relations with its licensees, something which the

Standstill prohibits.[19] MBI points to a series of letters written by Dorothy Weber, counsel for SPADEM, which Judge Cedarbaum found to violate the Standstill. *See* Transcript, November 1, 1994 at 16. In these letters, Ms. Weber contacted various MBI-licensees and informed them that they were obligated to get SPADEM's approval before manufacturing and reproducing Picasso images. To MBI, the *King Features* case should be enjoined because it is simply these letters turned into a federal complaint.

At the outset, the Court notes that MBI's cross-motion, while technically styled as a preliminary injunction, is in reality a request to enforce the Standstill. Most of MBI's argument is devoted to an analysis of why the *King Features* case violates the Standstill, and conspicuously absent from this argument is any detailed consideration of either irreparable harm or likelihood of success on the merits. Indeed, MBI has conceded that if the Standstill were not in place, it would not be moving for a preliminary injunction to enjoin the *King Features* case. Hearing Transcript, December 30, 1994 at 54.

■ Even if the Standstill remains in effect as is, the Court finds that the *King Features* case does not violate the Standstill. The *King Features* case is a Lanham Act case, involving claims that the named defendant companies are using the Picasso name, signature, and images in such a manner as to mislead the public to believe that their products are authorized or sponsored by the Picasso heirs and the Estate. By contrast, the current action before the Court involves various copyright and contract issues in which MBI claims the copyright interest in certain Picasso works of art and the right to reproduce those works on a variety of products, free from SPADEM's oversight. Copyright and trademark issues involve different prop-

---

**18.** *SPADEM v. King Features Syndicate, et. al.*, 94 Civ. 8781. The *King Features* case is now pending before this Court. In addition, SPADEM has also filed two other suits for trademark infringement in the Southern District of Florida and the Central District of California.

**19.** Paragraph 5 of the Standstill provides in relevant part that "the overriding purpose of this

Stipulation is to avoid, to whatever extent possible, the involvement by any of the parties hereto in the other party or parties' businesses including, but not limited to, the assertion of exclusive rights to sell or license products or prints containing images created by Pablo Picasso." *See also* Standstill ¶ 2.

erty rights, and it is not uncommon for various types of intellectual property to receive dual protection under both copyright and trademark laws. *See Frederick Warne & Co., Inc. v. Book Sales, Inc.*, 481 F.Supp. 1191, 1196–97 (S.D.N.Y.1979) (citing cases) (noting that copyright and trademark protections often co-exist, and sometimes overlap, without posing preemption difficulties).[20]

In addition, Judge Cedarbaum apparently felt that the letters sent by Ms. Weber violated the Standstill because they implied that MBI licensees had to gain SPADEM's approval before reproducing images. *See* Transcript, November 1, 1994 at 28. Pre-approval requirements are squarely at issue in the present lawsuit and do not relate to whether an MBI (or non-MBI) licensee is misleading the public by using the Picasso trademark. Moreover, the language of the Standstill itself focuses on the parties' rights to license, manufacture and sell products containing Picasso images without restriction by the other party. *See* Standstill at ¶ 2 ("None of the parties hereto, pending settlement or judicial resolution, shall state or imply to third parties that the opposing party or parties do not have valid rights to license, manufacture, or sell the prints or products containing images created by Pablo Picasso."). The Standstill does not refer in any way to trademark rights or place restrictions on the parties regarding those rights.

MBI is also not entitled to a preliminary injunction enjoining the *King Features* case on any independent ground. As noted above, MBI seeks a preliminary injunction because it alleges the *King Features* case will cause MBI's licensees and sub-licensees to discontinue business relations with MBI. It is true that the loss or destruction of an entire business can constitute irreparable harm. *See, e.g., Truglia v. KFC Corp.*, 692 F.Supp. 271, 279 (S.D.N.Y.1988), *aff'd* 875 F.2d 308 (2d Cir.1989) ("The loss or destruction of an entire business has also widely been held to constitute irreparable harm, at least when the business has been in operation for some time.") (citations omitted). However, MBI has presented little evidence that it would be irreparably harmed if the *King Features* case was allowed to proceed. Marilyn Goldberg states that MBI's United States Agent, King Features, Inc., has already notified twelve parties that it is withdrawing from MBI Picasso business. Affidavit of Marilyn Goldberg at ¶ 41. Given that MBI at the present has at least 71 license agreements for a wide variety of products, this assertion falls far short of establishing that MBI is in imminent danger of being destroyed. *See Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755 (2d Cir.1979) (in order to constitute irreparable injury, threat to business as a whole must be imminent). Likewise, Marilyn Goldberg has stated that without an injunction, MBI "may not be able remain in business." Affidavit of Marilyn Goldberg at ¶ 43. This conclusory assertion does not demonstrate that irreparable harm is a probability and not merely a possibility. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d at 79.

## IV. CONCLUSIONS

For the reasons stated above, the Court grants defendants' Motion to Vacate the Standstill Stipulation. The Court replaces the Standstill with the Order set forth as Exhibit A to this Opinion. The Court denies SPADEM's preliminary injunction motion. MBI's cross-motion for a preliminary injunction is also denied. The parties shall proceed with expedited discovery, which is to be completed by April 20, 1995. A joint pretrial order is due by May 11, 1995 and a jury trial shall begin on June 19, 1995. In addition, SPADEM shall inform all of the defendants in the *King Features* case that they must file an answer within ten days of receipt of this Order.

SO ORDERED.

---

20. As discussed above, SPADEM claims in its motion for a preliminary injunction that it will be irreparably harmed if MBI is allowed to use the 173 Jake Berg images because such use will infringe both its Picasso trademarks and its copyrights in the images. While the Court rejects these claims because of SPADEM's delay in bringing its motion, SPADEM's claim of irreparable injury from trademark infringement is not inconsistent with its position that the present case is not a trademark case. The gravamen of the present case is a copyright claim, even if a by-product of MBI's exploitation of the Berg images is alleged trademark infringement.

## EXHIBIT A

### STANDSTILL ORDER

1. Each of the parties shall continue to license, manufacture, or sell commercial products and/or sell prints containing images created by Pablo Picasso in accordance with the terms of the 1979 Paraselenes and 1980 VAGA Agreements, as detailed below.

2. None of the parties hereto, pending settlement or judicial resolution, shall state or imply to third parties that the opposing party or parties do not have valid rights to license, manufacture, or sell the prints or products containing images created by Pablo Picasso.

3. Should the parties wind up competing to sell or license Picasso images to the same third-party entity, they may not disparage the opposing party or parties and shall be limited to the simple statement, if asked, that the parties are involved generally in litigation relating to certain rights to the Pablo Picasso images and products. There shall be no discussion regarding the merits of such litigation nor the specifics of such litigation nor shall there be any statements regarding who is likely to win such litigation.

4. Should any of the parties be specifically asked by any third party as to the status of any dispute between them regarding rights to license products or sell prints containing images created by Pablo Picasso, the said parties must adhere to the limitations set forth in paragraph 3.

5. *Pre–Approval and Droit Moral:* (1) Pre–Approval: Those images which were sold by Marina Picasso pursuant to the 1980 VAGA agreement, and are now being exploited by MBI, are subject to the strict pre-approval required by that agreement. From November 30, 1994 (the date defendants filed their motion for a preliminary injunction) forward, MBI and its licensees must submit any commercial use of a Picasso image (either proposed or in use), not previously approved by SPADEM or any of its Committees or agents, to SPADEM for its approval. However, prints, posters, notecards, greeting cards, postcards, calendars without advertising, slides without advertising, and educational uses (puzzles, needlepoint kits) are approved types of uses in all cases. If the

commercial use is not approved by SPADEM within seven (7) days of receipt, MBI may choose between the following two methods of resolving the dispute:

(A) Special Master: The parties may select a mutually acceptable Special Master, whose costs shall be shared equally by plaintiff and defendants (50% each), who shall be required to rule on any challenge to SPADEM's refusal to approve the commercial use within five (5) business days of the submission of the challenge to the Special Master. The Special Master's decision shall be final, pending the outcome of all issues at the trial of this and related actions. If the parties cannot agree on the selection of a Special Master, the Court will select such a Special Master, from a list of four names to be submitted by the parties to the Court. The Special Master shall apply the standard set forth in the 1980 VAGA Agreement, namely the application of the *droit moral*, which guarantees that the use of the Picasso image will not mutilate or deform the image created by the artist. Moreover, the image may not be used on any item or in any way which would denigrate the name, honor, reputation or memory of Pablo Picasso. In any such challenge, MBI shall bear the burden of proving that the commercial use conforms with the *droit moral*.

(B) Magistrate Judge: Upon SPADEM's refusal to approve the proposed use, MBI may submit a challenge to Magistrate Judge Dolinger. The losing party shall pay all attorney's fees and costs associated with such a challenge. The *droit moral* standard and burden of proof, defined above, shall be applied by the Magistrate Judge.

(2) Enforcement of *droit moral:* Those images which were sold by Marina Picasso pursuant to the 1979 Parasalenes agreement, and are now being exploited by MBI, are subject to the application of the *droit moral*. Thus, if the defendants believe that any use of a Picasso image that was first used after November 30, 1994 (the date defendants filed their motion for a preliminary injunction) violates the *droit moral*, defendants may challenge such use by the method selected by

the plaintiff (either the special master or magistrate judge methods detailed in (1)). In any such challenge, defendants shall bear the burden of proving that the commercial use does not conform with the *droit moral.*