■ NBT BANCORP, INC., et al., Appellants, v FLEET/NORSTAR FINANCIAL GROUP, INC., Formerly Known as NORSTAR BANCORP, INC., et al., Respondents.—Mikoll, J. Appeal from an order and judgment of the Supreme Court (Coutant, J.), entered July 21, 1989 in Chenango County, which, *inter alia,* granted defendants' motion to dismiss the complaint for failure to state a cause of action.

Plaintiffs sued defendants claiming (1) interference with contractual relations, (2) tortious inducement of breach of contract, and (3) tortious interference with prospective business relations. These causes of action have as their genesis a proposed merger between plaintiff National Bank and Trust Company of Norwich, a wholly owned subsidiary of plaintiff NBT Bancorp, Inc. (hereinafter NBT), and Central National Bank (hereinafter Central). Defendants' motion to dismiss the complaint for failure to state a cause of action pursuant to CPLR 3211 was granted by Supreme Court and this appeal by plaintiffs ensued.

The complaint alleged that plaintiffs and Central executed a merger agreement which required approval by the owners of two thirds of the shares of common stock of Central and the Comptroller of the Currency, a division of the United States Treasury Department, before it would take effect. The agreement, *inter alia,* provided that Central's directors would use their best efforts to secure stockholder approval and refrain from soliciting other merger proposals or disseminating nonpublic information.

Plaintiffs alleged that defendants intentionally interfered with the performance of the merger agreement and their relationship with Central. The complaint alleged the following acts in support of plaintiffs' claims: (1) despite knowledge of the merger agreement, defendants intentionally interfered with its performance in that they conspired with Herbert Kling, a dissident director of Central, to oppose the merger by counseling him on how to oppose it, (2) defendants met with Kling and received nonpublic information from him, (3) defendants secretly accumulated 5% of the outstanding stock of

NBT which they dumped on the securities market at below-market prices to create the illusion that the value of NBT's stock was less than that ascribed to it by NBT, so as to discredit the merger, (4) defendants sent a letter to Central's board of directors (hereinafter the Board) misrepresenting the value of NBT stock based on the below-market sale defendants engineered and accusing Central's individual directors of placing personal interest ahead of that of the stockholders and of acting improperly in reaching the merger agreement, (5) Kling disseminated the letter to local newspapers which carried stories about the merger, including the allegations contained in the letter, (6) economic pressure was used to foment confusion including separate litigation brought by Kling against NBT in Federal court accusing Central's Board of breach of fiduciary duty, (7) within 24 hours of NBT raising its offer, defendants presented an offer on better terms; this was done to persuade Central not to perform its contract with plaintiffs and, as a result, Central adjourned the scheduled shareholders meeting to approve the merger and terminated the agreement, (8) all the acts were done by defendants to secure an economic advantage at plaintiffs' expense, in which efforts defendants were abetted by Kling who violated his duty of loyalty as a director of Central in seeking to abort the merger, (9) as a result, plaintiffs were deprived of the banking business of Central and the profits for the merger, and (10) plaintiffs agreed to accept $150,000 for permitting Central to terminate the merger agreement.

Addressing the dismissal of the complaint, we conclude that the cause of action for inducement of breach of contract was appropriately dismissed. To succeed on this action a plaintiff must prove, *inter alia,* that a defendant intentionally induced the breach of contract *(see, Israel v Wood Dolson Co.,* 1 NY2d 116, 118). Assuming for the purposes of this motion, as we must, that plaintiffs' allegations are true *(see, John R. Loftus, Inc. v White,* 150 AD2d 857, 859), the facts alleged are insufficient to find that defendants induced Central to breach the merger agreement. The complaint alleges that Central's directors, including Kling, breached provisions requiring them to use their best efforts to secure shareholder approval and refrain from soliciting new offers or disclosing nonpublic information. It is not alleged, however, that the Board initiated contact with any person or entity in an attempt to secure an acquisition proposal. The only allegation apropos of other offers is that Central entertained defendants' offer which defendants initiated. Regarding the agreement not to dissemi-

nate nonpublic information, the complaint did not state that the Board did so or authorized any director, officer, employee or other party to initiate contact for the purpose of obtaining competing proposals.

Allegations that Central breached the merger agreement by adjourning the special shareholders' meeting to consider defendants' offer are totally inadequate to support the cause of action for tortious inducement of breach of contract. It would have been a breach of the Board's fiduciary duty to hold the scheduled meeting without allowing time for notice and evaluation of defendants' offer (see, Business Corporation Law § 717; *Alpert v 28 Williams St. Corp.,* 63 NY2d 557, 568; see also, *TSC Indus. v Northway, Inc.,* 426 US 438, 449). As a matter of law, such action did not contravene Central's agreement to use its best efforts to secure shareholder approval.

The allegation that Central breached the merger agreement through the acts of Kling is also not supported by the complaint. The provision requiring "best efforts" specifically applied to the individual directors, not Central. The provision cannot be interpreted to interfere with a director's fiduciary duties to his company. Kling never supported the merger agreement and he acted independently of the Board in his opposition. There is no allegation in the complaint that his acts were authorized by Central. Thus, the cause of action for intentionally inducing the breach of contract was properly dismissed because the complaint failed to allege that the acts breached the terms thereof. As a final observation on the issue, we have here interference with a prospective contractual relationship which depended on the approval of stockholders. As the Court of Appeals noted in *Guard-Life Corp. v Parker Hardware Mfg. Corp.* (50 NY2d 183, 191), "greater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interest in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer)".

Plaintiffs' cause of action alleging tortious interference with their prospective business relations was, however, improperly dismissed by Supreme Court. Plaintiffs pleaded facts from which it could be concluded that defendants used unlawful means to injure plaintiffs (see, *Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183, supra; *Terry v Dairymen's League Co-op. Assn.,* 2 AD2d 494, 500). Plaintiffs asserted that

defendants misrepresented the value of their stock to Central and "dumped" the stock at a price below market although they were informed by their broker that they could obtain a higher price. This accusation, accepted for purposes of the motion as true, supports the conclusion that defendants engaged in unlawful manipulation of stock prices in violation of section 17 (a) of the Securities Act of 1933 and section 10 (b) of the Securities Exchange Act of 1934 (see, 15 USC § 77q [a]; § 78j [b]; see also, Basic, Inc. v Levinson, 485 US 224).

The complaint also alleged that the disputed stock sale occurred on the day before the merger document was to be signed. The price at which defendants sold the stock was the price which they represented to Central was its true fair market value. These actions indicate that there was a plan to influence Central to terminate the merger agreement. Further, the complaint also alleged that plaintiffs sustained special damages as a result of these actions. It is important to note that we do not have before us a motion for summary judgment but for dismissal for failure to allege a cause of action. This court should not, therefore, decide what inferences would be drawn from the facts pleaded but leave that for the trier of facts to resolve after the presentation of the evidence. Thus, plaintiffs' pleadings set forth a cause of action for tortious interference with prospective business relations.

Next, we affirm Supreme Court's dismissal of plaintiffs' cause of action for tortious interference with contractual relations. To plead a cause of action for intentional interference with contractual relations and/or for intentional and improper interference with the performance of a contract under New York law, the pleader is required to allege a breach of the contract (see, Israel v Wood Dolson Co., 1 NY2d 116, 120, supra; see also, Lamb v Cheney & Son, 227 NY 418, 421), which plaintiffs have failed to do in this case. Plaintiffs assert that the Court of Appeals decision in Guard-Life Corp. v Parker Hardware Mfg. Corp. (supra, at 183), where that court quoted from Restatement (Second) of Torts § 766, signifies that an allegation of breach of contract is no longer required in pleading these causes of action. In our view the Court of Appeals relied on the language of the Restatement to establish that wrongful means are required to tortiously interfere with voidable contracts. This view is supported by the Court of Appeals later affirmance of Gregoris Motors v Nissan Motor Corp. (54 NY2d 634, affg 80 AD2d 631). This failure to allege a breach of the merger agreement is fatal to the cause of action for interference with contractual relations. We find it

unnecessary to reach and consider the other issues Supreme Court raised in its decision dismissing this cause of action.

As to defendants' assertion that plaintiffs' acceptance of Central's offer of $150,000 to terminate the merger agreement constituted a waiver of plaintiffs' claims in this action, we find this argument unpersuasive. There is no showing that any such waiver occurred in the record.

Order and judgment modified, on the law, without costs, by reversing so much thereof as granted the motion dismissing the cause of action for tortious interference with prospective business relations; motion denied as to said cause of action; and, as so modified, affirmed. Casey, Mikoll and Yesawich, Jr., JJ., concur.

Kane, J. P., and Levine, J., concur in part and dissent in part in a memorandum by Levine, J. Levine, J. (concurring in part and dissenting in part). We respectfully disagree with the majority's ruling that a valid cause of action for tortious interference with prospective business relations was pleaded by plaintiffs and, while we, too, support the dismissal of plaintiffs' cause of action for tortious interference with contractual relations, we do so on a different ground than the majority. Our reasoning requires a fuller description of the sequence of events and the conduct of the parties, as alleged in the complaint, and a more detailed analysis of the documents attached to and made a part of the complaint.

According to the complaint, the pertinent events began on November 4, 1986 when the board of directors (hereinafter the Board) of Central National Bank (hereinafter Central) in Canajoharie, Montgomery County, met, at the Central Board's invitation, with representatives of three financial institutions, defendants, KeyCorp of Albany and plaintiffs, to hear their separate proposals for a merger of Central into a bank subsidiary of their respective bank holding companies. No action was taken by the Central Board at that meeting. On November 7, 1986, however, a bare majority of the 11-member Central Board voted to accept an *amended* proposal from plaintiffs for merger of Central into plaintiff National Bank and Trust Company of Norwich (hereinafter Norwich), the wholly owned subsidiary of plaintiff NBT Bancorp, Inc. (hereinafter NBT). On or before November 7, 1986, however, defendants "dumped" their holdings of shares of NBT, representing a fraction more than 4% of all outstanding shares, on the open market at a price of $19 per share "for the purpose of creating an illusion in the minds of the Central board that

NBT stock did not have the value ascribed to it by NBT", and "of lowering the apparent value of NBT common stock then being offered to the Central stockholders".

On November 8, 1986, a formal merger agreement was entered into between Central and plaintiffs, signed by Central's president and the six directors (including the president) who had voted for the merger. The five dissenting directors did not execute the agreement. The merger agreement fixed the value of Central's stock at $61 a share and provided that Central shareholders would receive, in exchange for each such share, the number of NBT shares equal to $61 divided by the average closing price of an NBT share over the 20 trading days ending five days before the closing, with a minimum price per NBT share of $20.90 and a maximum price of $23.10. The merger was made expressly contingent, *inter alia,* upon the approval of the holders of two thirds of the outstanding capital stock of Central at a meeting to be called for that purpose. Central and plaintiffs each obligated themselves to cooperate in the preparation and filing of a registration statement and proxy statement with the Federal Securities and Exchange Commission (hereinafter SEC). The agreement recited that Central, its officers and directors "shall use their best efforts * * * to obtain the written approval * * * of this Agreement * * * by the shareholders of Central * * * and shall do any and all things * * * necessary or appropriate in order to cause this Agreement to be consummated on the terms herein provided". Central's Board agreed to confirm to its stockholders that the Board believed that the terms of the agreement were "fair to the shareholders from a financial point of view" and in their best interests. Central also obligated itself not to initiate, directly or indirectly, contact with anyone else in an effort to solicit an alternative acquisition proposal or to authorize or permit any director or officer to do so, and to notify NBT if it received any alternative offer. Central further agreed that it would not, except as required by law, disclose any nonpublic information concerning its business to any other persons in connection with any alternative acquisition proposal.

The complaint further alleges that shortly after the execution of the agreement, defendants contacted Herbert Kling, one of the five Central directors who had voted against the merger, seeking nonpublic information pertaining to the Board's meeting of November 7, 1986. Then Kling met with officers of defendants, confirmed his continued opposition to the merger and received their advice on how to mount a

campaign to defeat stockholders' approval. On December 1, 1986, the president of defendants wrote to Central's president and directors complaining of improprieties in the process of the Board's consideration of the merger proposals, namely, in only giving plaintiffs an opportunity to submit a second, modified proposal and rationalizing this decision by ascribing to NBT shares a value 10% greater than their market value at the time. The letter suggested that the majority of directors "put personal preference before stockholder interest" and that, if the merger failed in gaining stockholder approval, defendants might elect to attempt a hostile takeover and then terminate existing management.

The complaint goes on to allege that, in compliance with the agreement, Central's management scheduled a stockholders' meeting for June 10, 1987 to vote on the merger, filed with the SEC the necessary registration and proxy statements, and solicited proxies favoring the merger. There then followed an intensive proxy contest with the opponents of the merger and a propaganda war in which Kling released to the press defendants' December 1, 1986 letter to the Central Board previously described. The proxy war erupted into litigation, in which NBT sued Kling and his group of organized opposition to the merger in the United States District Court, for violation of Federal securities laws and regulations regarding the solicitation of proxies, and Kling and his group countered by suing Central, the Central Board's majority and plaintiffs, alleging breach of fiduciary duty and misrepresentations in the merger proponents' proxy materials.

Then, it is alleged, NBT met with Central's management and proposed to increase its acquisition offer from $61 to $66 per share of Central stock if Central's dissenting directors agreed to support the merger. Central's Board met May 29, 1987 to consider NBT's new proposal. During that session, Kling and other dissenting directors withdrew from the meeting and, within the hour, returned with a letter from defendants containing an alternative proposal to acquire Central at more than $66 per share. The complaint asserts that, as a result of the new offer from defendants, the Kling Federal court action and the publicity, all "engendered" by defendants, Central determined to adjourn the stockholders' meeting and no longer support the merger under the terms of the agreement. Central settled the termination of the merger with NBT by paying $150,000 to NBT, representing about one half of NBT's expenses, in exchange for releases from liability to Central and its directors. The complaint seeks damages repre-

senting profits allegedly lost by the termination of the merger with Central and the balance of out-of-pocket expenses.

On the basis of the foregoing facts alleged in plaintiffs' complaint, we agree with the majority's conclusion that plaintiffs' cause of action for tortious inducement of breach of contract is not viable because of the legal insufficiency of plaintiffs' pleadings that the merger agreement was breached by Central or its Board. The activities of Kling and other dissenting directors cannot, as a matter of law, constitute a breach of the agreement. Kling was not a signatory to the agreement and never purported to be acting on behalf of Central or the Board. Kling and his cohorts on Central's Board, as directors, were "not stripped of the ability to act as individual investors" in opposing the merger they believed to be contrary to their interests or in promoting counterproposals, despite the "best efforts" and "no-solicitation" clauses of the merger agreement *(STV Engrs. v Greiner Eng'g,* 861 F2d 784, 788). There is no allegation in the complaint that Kling's sharing of "nonpublic information" with defendants, as to the underlying circumstances of the acceptance by the majority of Central's Board of plaintiffs' November 7, 1986 proposal or the terms of plaintiffs' "sweetened" offer of late May 1987, was other than for the purpose of opposing the merger with plaintiffs for business reasons, nor is it alleged that Kling's disclosure to defendants was of privileged or proprietary information in violation of any duty to Central.

Likewise, apart from conclusory allegations, plaintiffs have not alleged any other actionable breach of contract by Central or its Board members who signed the merger agreement. The facts pleaded by plaintiffs establish that, until the May 29, 1987 Board meeting, Central's management fully and in good faith pursued the steps necessary to consummate the merger of Central and NBT in compliance with the agreement. It is not alleged that Kling's sharing of information with defendants or his other efforts to block the merger was condoned, consented to or encouraged by Central. Nor did a breach of the best efforts clause occur, as a matter of law, when, in response to plaintiffs' new offer of a higher price per share and defendants' higher counteroffer, Central's Board decided to adjourn the June 10, 1987 stockholders' meeting and propose the termination of the merger agreement. Faced with new offers at terms more attractive to stockholders than that of the merger agreement, the Board had no choice but to disclose these developments to the stockholders *(see, Jewel Cos. v Pay Less Drug Stores Northwest,* 741 F2d 1555, 1564).

Regardless of their obligations under the "best efforts" clause they signed, the Central Board "had a fiduciary duty to inform [Central's] shareholders that a competing [more attractive] offer had been made * * *. It also had a duty to make recommendations in light of the new, higher offer, and to not permit a vote to be taken on [June 10] when the proxies collected had been solicited upon the [majority's] recommendation based on a situation which had substantially changed since the time the proxies had been mailed" *(R-G Denver v First City Holdings,* 789 F2d 1469, 1475). Central, thus, could validly and legally conclude that it was no longer able to recommend stockholders' approval of a merger agreement that was less beneficial to its stockholders than subsequent proposals.

Plaintiffs are correct in asserting, however, that their cause of action for tortious interference with contractual relations is not automatically defeated because Central and its majority Board members committed no actionable breach of contract by failing to consummate the merger. It is sufficient if defendants' conduct " 'intentionally and improperly interferes with the performance of a contract' " by causing Central not to perform the merger agreement *(Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183, 189, quoting Restatement [Second] of Torts § 766). As the previous analysis demonstrates, however, Central and the members of its Board who signed the merger agreement meticulously performed their obligations thereunder until they received the more favorable proposals from plaintiffs and defendants some two weeks before the scheduled stockholders' meeting and concluded that the meeting had to be adjourned for the required disclosure of these proposals. Once Central correctly concluded that it had the duty to inform the stockholders of the better offers before there could be a vote on the merger agreement, the inescapable inference is that Central's Board also correctly concluded that submission of the merger agreement to stockholders would be futile and, hence, the proposed merger under the terms of the agreement should be abandoned by mutual consent.

Accepting, as we must, the allegations of the complaint that defendants' conduct brought about this unfortunate turn of events for plaintiffs, nonetheless, the foregoing shows that defendants' tortious interference, if any, was with the obtaining of stockholders' approval, the last act of Central necessary to make the agreement to merge complete and binding. This is confirmed by the nature of plaintiffs' primary claim of dam-

ages, the loss of profits it would have achieved had the merger gone through. As to stockholders' approval, however, the merger agreement, just as the supply contract in *Guard-Life Corp. v Parker Hardware Mfg. Corp. (supra),* lacked mutuality in the sense that it was voidable at the complete discretion of Central shareholders holding one more than one third of the outstanding capital stock of the corporation. Also, as in *Guard-Life,* defendants were concededly acting at all times as a competitor of plaintiffs for the acquisition of Central and in furtherance of their competing interest. *Guard-Life* holds that where a contract is, thus, voidable for lack of mutuality, the interest of the complaining contracting party is akin to that of a party to a contract entirely terminable at will. In both cases "the party seeking to impose liability [against the interferor] enjoys no legally enforceable right to performance; his interest [in full performance] is a mere expectancy—a hope of future contractual relations" *(Guard-Life Corp. v Parker Hardware Mfg. Corp., supra,* at 193). In the context of a merger agreement such as that of Central and plaintiffs, the court in *Jewel Cos. v Pay Less Drug Stores Northwest* (741 F2d 1555, *supra)* similarly held that the acquiring party only has a mere expectancy with respect to consummation of a merger *(supra,* at 1563), in that the board of directors "can only bind the corporation temporarily, and in limited areas, pending [discretionary] shareholder approval" *(supra,* at 1564). The result is that, although plaintiffs may sue for tortious interference with contractual relations without pleading and proving an actionable breach of contract by Central, the legal sufficiency of their pleadings of this cause of action, under the circumstances, is dependent on appropriate allegations that "the means employed to effect the interference was wrongful" *(Guard-Life Corp. v Parker Hardware Mfg. Corp., supra,* at 196, citing Restatement [Second] of Torts § 768). Thus, just as is concededly the case with plaintiffs' remaining cause of action for tortious interference with prospective business relations, the cause of action for interference with contractual relations must be dismissed if the complaint's allegations of wrongful means to effectuate either interference are legally insufficient.

Plaintiffs allege some six wrongful means of defendants' interference with the consummation of the merger. Of these, two are based upon Kling's acts in organizing stockholder opposition to the merger and in sharing information with defendants. However, no unlawful inducement of Kling by defendants is alleged. While it is debatable whether plaintiffs

claim anything more than that defendants supported and encouraged Kling's independently engendered opposition to the merger, at most, plaintiffs have alleged that defendants persuaded Kling to engage in opposition. However, mere persuasion by a competitor is insufficient as a wrongful means (see, Guard-Life Corp. v Parker Hardware Mfg. Corp., supra, at 191). Moreover, as has already been discussed, there was nothing illegal in Kling's sharing of information with defendants. Next, plaintiffs allege that defendants' December 1, 1986 letter to Central's Board constituted an improper means in (1) wrongfully misrepresenting the value of NBT's stock on the date of Board acceptance of plaintiffs' merger proposal, and (2) accusing the majority of Central's Board of improprieties in accepting plaintiffs' proposal and threatening a hostile takeover and firing of management in the event the merger agreement did not receive stockholder approval. However, there are no allegations of how the December 1 letter actually interfered with plaintiffs' expectancy of consummation of the merger. Clearly, no such causal relationship between any disparagement of the value of NBT stock as of November 7, 1986 and the aborting of the transaction in late May 1987 can be reasonably inferred. Other allegations of the complaint dispel any inference that defendants' December 1 letter created an "impression" on the part of Central's Board that NBT had inflated the value of its stock in its November 7 proposal, in that the Board's majority, long after the December 1 letter, fully supported the merger by proceeding with SEC filings and solicitation of proxies in favor of the merger. The same actions in favor of the merger by the Board's majority subsequent to the December 1 letter dispel any inference that the accusation of improprieties and threats of economic sanctions upon a hostile takeover had any effect. Indeed, if anything, such threats would have encouraged a redoubling of the efforts of Central's management to have the merger succeed, thereby preserving existing management's positions.

Next, plaintiffs allege that defendants engaged in wrongful means to defeat the merger by encouraging Kling to sue NBT and Central's management in the Federal courts. The gravamen of Kling's complaint, as described by plaintiffs, was that Central's directors who approved plaintiffs' proposal breached their fiduciary duty to shareholders by acting for their own personal financial advantage. Prosecution of civil suits may constitute a wrongful means of interfering with contractual or prospective business relations (Restatement [Second] of Torts § 767, comment c, at 30-31). However, bringing civil litigation

is ordinarily wrongful only "if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes * * * the litigation in bad faith, intending only to harass the third parties and not bring his claim to definitive adjudication" *(id.,* at 31). There is no allegation that Kling's suit was believed by him to be groundless or that it was instituted in bad faith. And, again, no reasonable inference can be drawn from the allegations of the complaint that Kling had anything but a sincere belief that his fellow directors in the majority were acting for their own self-interests, a position taken by Kling throughout this matter, or that he would not have pursued his action to its conclusion had the merger not been called off.

Finally, plaintiffs allege that defendants used wrongful means in "dumping" their NBT stockholdings "on or before November 7, 1986", to depress the value of NBT's stock, in violation of Federal securities laws and regulations. We find this claim insufficient because of the absence of pleaded facts from which it can be inferred that any alleged depression of the market value of NBT stock on or before November 7, 1986 was a substantial factor in the termination of the transaction more than six months later. Even if the dumping of the NBT stock was wrongful, plaintiffs were still required to plead and prove a causal relationship between this wrongful means and the injury sustained, i.e., that the improper interference " 'cause[d] the third person not to perform' " *(Guard-Life Corp. v Parker Hardware Mfg. Corp., supra,* at 189, quoting Restatement [Second] of Torts § 766) or "caus[ed] a third person not to enter into * * * the prospective [business] relation[ship]" (Restatement [Second] of Torts § 766B [a], at 20; *see also,* Restatement [Second] of Torts § 766, comment *h).*

The most reasonable unfavorable inference to be drawn from the alleged dumping of the NBT stock on or before November 7, 1986 was that it was for the purpose of depressing the value of the stock in order to forestall the formal execution of the merger agreement, in light of plaintiffs' claim that the purpose was of "creating an illusion in the minds of the Central board" that NBT had inflated the value of its stock in its proposal. If this was its purpose, defendants' sale of NBT stock was obviously ineffective, since in fact the merger agreement was executed the next day. Equally obvious, the dumping of NBT shares had no effect on Central's management and Board majority during the lengthy ensuing period when they actively took the steps necessary to effectuate the merger. Nor can it reasonably be inferred from the

pleadings that the sale of NBT shares in early November 1986, even if it then depressed the market value of NBT stock, played any part whatsoever in the Central Board's decision to propose terminating the transaction in late May 1987. As previously described, the merger agreement placed a floor of $20.90 a share and a ceiling of $23.10 a share on the value of NBT stock for purposes of the exchange of Central shares for stock in NBT in the merger. Any depression of the value of NBT shares down to the $20.90 minimum price per share would increase the number of NBT shares receivable by Central stockholders in the merger, and thus act as an incentive to stockholders' approval. Therefore, without an averment in the complaint that, in fact, as a result of the dumping of NBT shares in November 1986 the market value thereof was depressed below the $20.90 per share floor provided in the agreement, as the date of the scheduled stockholders' meeting approached in June 1987, a fact easily ascertained and pleaded if so, the dumping of shares cannot be established as a causal factor in the failure of the merger. Any contrary inference would be entirely speculative and unsupported by the factual allegations of the complaint.

Since each and every wrongful means alleged in the complaint was either entirely proper and lawful or was not a substantial factor in bringing about the termination of the merger agreement, plaintiffs' causes of action for tortious interference with contractual relations and interference with prospective business relations were legally insufficient, and Supreme Court correctly dismissed the complaint in its entirety. Consequently, we would affirm Supreme Court's order in all respects.