**MUSEUM BOUTIQUE INTERCONTINENTAL, LTD., Plaintiff,**

v.

**Claude PICASSO, Paloma Picasso, Societe de la Propriete Artistique et des Dessins et Modeles, Succession Picasso, Defendants.**

No. 93 Civ. 6119 (SAS).

United States District Court, S.D. New York.

June 2, 1995.

Hugh C. Hansen, Gerald M. Levine, Calotta Levine Samuel & Schreiber, New York City, for plaintiff Museum Boutique Intercontinental, Ltd. ("MBI").

Dorothy M. Weber, Peter S. Shukat, Shukat Arrow Hafer & Weber, L.L.P., New York City, for defendants Claude Picasso and Societe de la Propriete Artistique et des Dessins et Modeles ("SPADEM").

William J. Schwartz, Kronish, Lieb, Weiner & Hellman L.L.P., New York City, for defendant Paloma Picasso.

## OPINION

SCHEINDLIN, District Judge.

Defendant Paloma Picasso ("Paloma") moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all counts against her in the Second Amended Complaint filed by Plaintiff Museum Boutique Intercontinental, LTD.

("MBI").[1] For the reasons set forth below, the motion is granted.[2]

## BACKGROUND

The full background to this case is set forth in the Court's February 1, 1995 Opinion and Order. However, a brief summary is necessary in order to understand the context of the present motion. MBI is a New York corporation which creates and licenses artistic designs incorporating images from famous works of art, including works by Pablo Picasso. Pablo Picasso, of course, is one of the most famous artists of the twentieth century who created more than one hundred thousand works of art prior to his death in 1973. Paloma Picasso is the daughter and one of the heirs of Pablo Picasso.[3]

After Pablo Picasso's death, his actual works of art were divided among his heirs. However, the reproduction rights in the works remained in the Picasso Estate, or Succession Picasso, as the joint property of the heirs. Under French law, this joint property is known as the *indivision successorale* (*"indivision"*), and the joint ownership of the reproduction rights continues in effect until the heirs individually opt out or become subject, either through agreement among themselves or court decision, to a division, or *partage*, of the property. *See* Affidavit of Professor George A. Bermann, ("Bermann Aff."), dated March 31, 1995 at ¶¶ 9–10.[4] In 1976, the heirs and the Societe de la Propriete Artistique et des Dessins et Modeles ("SPADEM") entered into an agree-

---

1. Defendants Claude Picasso, Societe de la Propriete Artistique et des Dessins et Modeles, and Succession Picasso have also moved to dismiss Counts IV, VII, IX, XI, XII, and XIII of the Second Amended Complaint. The Court does not decide that motion at this time.

2. All of the Defendants initially moved to dismiss the First Amended Complaint, which was filed on May 26, 1994. At oral argument on this motion, the Court granted MBI leave to replead certain counts and file a Second Amended Complaint. *See* Transcript of Oral Argument, February 1, 1994 at p. 11. Although the parties have submitted additional papers in connection with this latest version of the Complaint, the Court has considered all submissions, whether in connection with the First or Second Amended Complaint, in deciding the instant motion.

3. The heirs of Pablo Picasso consist of his children and grandchildren, including Claude, Paloma, Maya, Marina, and Bernard Picasso.

4. Both sides submitted expert affidavits on the issue of whether Paloma is amenable to suit in her capacity as a Picasso heir under applicable principles of French law. The Court also held a hearing on this issue on May 23, 1995. Paloma's expert, Professor Bermann, testified at the hearing. MBI submitted an expert affidavit from Simon Abergel, a French attorney. Abergel did not testify at the hearing because MBI could not make him available, but counsel for Paloma chose to proceed with the hearing even though he admitted that he would not have the opportunity to cross-examine Abergel. *See* Transcript of Expert Hearing, May 23, 1995, at p. 4.

ment which granted SPADEM the right to administer, manage and exploit the Picasso name, image and likeness in connection with reproductions of Picasso artwork.[5] In 1989, a French court appointed Claude Picasso Administrator of the Indivision in order to facilitate the management of the reproduction rights. *Id.* at ¶ 12. The French court also authorized Claude to contract with SPADEM to assist him in commercially exploiting Pablo Picasso's works. *Id.* at ¶ 18.

In 1980, MBI allegedly acquired exclusive licenses to reproduce certain Picasso paintings and create derivative works incorporating these images.[6] However, these licenses were the almost immediate subject of dispute between MBI and Jackie Fine Arts and the Picasso Estate, and the Picasso Estate brought suit in New York Supreme Court to establish the rights of the parties in the images and associated copyrights. The lawsuit was settled in 1980 by an agreement between the parties which essentially gave MBI the continued right to exploit and reproduce certain Picasso images, subject to the oversight of the Picasso heirs. *See MBI v. Claude Picasso, et al.*, 880 F.Supp. 153, 157–58 (S.D.N.Y.1995). During the ensuing decade, the parties continued to dispute, threaten litigation, and negotiate settlements of various issues arising in connection with the exploitation of the reproduction rights. In 1993, MBI brought this suit against the named defendants.[7]

In its Second Amended Complaint, MBI claims that defendants SPADEM, Claude Picasso, and Succession Picasso have infringed MBI's exclusive rights in the Picasso works and seeks declaratory and injunctive relief to bar these defendants from making any infringing use of those works. *See* Second Amended Complaint at Counts One and Two. In addition, MBI alleges that the defendants have engaged in false designations of origin by using MBI derivative works (Count Four); trade secret misappropriation (Count Five); conduct constituting promissory estoppel (Count Six); intentional interference with contractual relations with MBI's Japanese manufacturers and distributors (Counts Seven and Eight); breach of contract (Count Nine); unjust enrichment (Count Ten); deceptive acts and practices (Count Eleven); unfair competition (Count Twelve); and defamation and trade disparagement (Count Thirteen). With the exception of Count Seven, the only actions alleged in the Complaint are actions taken by SPADEM, Succession Picasso, or Claude Picasso in connection with the *indivision.*

Count Seven of the Second Amended Complaint claims defendants tortiously interfered with MBI's contractual relations and is the only count which contains claims against Paloma in her personal capacity. In its proposed Count Seven,[8] MBI alleges that it had valid license agreements with the Japanese companies Nayoya Mitsukoshi Ltd. ("Mitsukoshi") and INFAS Co., Ltd. ("INFAS") to sell MBI derivative works and reproductions of Picasso works of art. Proposed Count Seven at ¶ 183. MBI also claims that SPADEM, Claude and Paloma Picasso had actual knowledge of these agreements and that these defendants falsely advised Mitsukoshi

---

5. SPADEM is a French organization engaged in protecting the intellectual property rights of individual artists on a worldwide basis.

6. The original works of art are part of the collection of Marina Picasso. MBI acquired its reproduction rights in these works from numerous investors who had purchased the rights in the images from Art Masters International or its successor, Jackie Fine Arts. The latter entities are art publishers who had previously acquired the rights in the images directly from Marina Picasso.

7. MBI originally filed its complaint in New York Supreme Court. After defendants removed the action to this Court, the parties entered into a Standstill Stipulation. After the case was trans-

ferred to me in November, 1994, both sides moved for a preliminary injunction. On February 1, 1995, I denied both parties' motions for a preliminary injunction and issued a revised Standstill Order. *See MBI v. Claude Picasso, et al.*, 880 F.Supp. 153 (S.D.N.Y.1995).

8. At oral argument on Defendants' Motions to Dismiss, the Court allowed MBI to submit a proposed Count Seven which would not become a part of the Second Amended Complaint unless the Court found that it stated a claim for relief. I have considered this proposed Count in analyzing Paloma's Motion to Dismiss, and all references in this Opinion are to the proposed Count Seven contained in MBI's letter of February 10, 1995 ("Proposed Count Seven").

and INFAS that MBI had no right to license or sell MBI derivative works of art in order to induce a breach of the licensing agreements. *Id.* at ¶¶ 184–185. Specifically, Paloma is alleged to have falsely advised Mitsukoshi and INFAS on June 28, 1991 that they had acquired rights from MBI "who actually has no power to grant them," and that Paloma "continued to make such statements up until MBI was coerced and induced into terminating [its contracts with Mitsukoshi and INFAS] in 1993." *Id.* at ¶ 186.

In addition, MBI claims that Paloma's statements made MBI, INFAS, and Mitsukoshi's "performance more difficult and lessened each party's enjoyment of the contract." *Id.* at ¶ 187. Specifically,

> Mitsukoshi and INFAS lost faith in MBI and sought continuous reassurance from MBI. Mitsukoshi was forced to fly two million dollars of its prototypes to New York for a product review. MBI spent many working hours trying to assure Mitsukoshi and INFAS that it had the rights to license these goods and in contact with Claude Picasso and SPADEM to make sure that they would not sue MBI's agents and licensees.

*Id.* Claude Picasso also sought the termination of the Mitsukoshi and INFAS contracts as part of the Global License Agreement that he was negotiating with MBI.[9] *Id.* at ¶ 189. Finally, MBI alleges that Paloma and Claude's actions drove MBI to seek the Global Licensing Agreement and subsequently caused MBI to terminate its contracts with Mitsukoshi and INFAS. *Id.* at ¶ 189–90.

## DISCUSSION

When considering a Rule 12(b)(6) motion, a court must presume all material factual allegations in the complaint to be true and must construe all reasonable inferences in a light most favorable to the plaintiff. *Paulemon v. Tobin,* 30 F.3d 307, 308 (2d Cir.1994). The complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 309 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

Paloma argues that the complaint should be dismissed for two reasons. First, she claims that in every count except Count Seven she is sued solely in her capacity as a Picasso heir for the acts of Claude Picasso as Administrator of the Succession Picasso and for the acts of SPADEM as the Administrator's agent. Under French law, Paloma argues that an heir is not amenable to suit for any act alleged to have been taken by the Administrator in connection with the exploitation of Picasso reproduction rights. Second, Paloma claims that Count Seven—the only count in which Paloma is sued in her personal capacity—fails to state a claim for tortious interference with contract under New York law.

### A. Paloma's Capacity To Be Sued As A Picasso Heir

Both parties agree that in every count except Count Seven, Paloma is not sued in her personal capacity. *See* Paloma Picasso's Memorandum of Law ("Paloma Mem.") at p. 3; MBI's Memorandum of Law ("MBI Mem.") at p. 2. No count in the Second Amended Complaint other than Count Seven refers to or alleges facts involving Paloma; rather, in eleven of twelve remaining counts Paloma is sued solely because of her status as a Picasso heir for the acts of Claude Picasso as Administrator of the *indivision* and SPADEM as the Administrator's agent.[10] However, the parties disagree about whether i) New York or French law

---

9. The Global License Agreement was a proposed agreement between MBI and SPADEM to settle the parties' disputes over the Picasso images. The negotiations took place in April, 1992 and did not result in an agreement. *See MBI v. Claude Picasso, et al.,* 880 F.Supp. 153, 159 (S.D.N.Y.1995).

10. Counts One and Two (declaratory relief and copyright infringement) are against "Succession Picasso" and "defendants"; Count Four (false designation of origin) is against "defendants" and the "Picasso heirs"; Counts Five (trade secret misappropriation), Eleven (deceptive acts), Twelve (unfair competition), and Thirteen (defamation) are against "defendants"; Count Six (promissory estoppel) and Count Ten (unjust enrichment) are against "Succession Picasso"; and Count Nine (breach of contract) is against the "Picasso heirs."

should be used to determine if Paloma can be sued as a Picasso heir, and ii) Paloma can be sued as an heir under New York or French law.

■ MBI argues that under Fed.R.Civ.P. 17(b), the law of the state in which this Court sits must be used to determine whether Paloma may be sued in her capacity as an heir. Rule 17(b) provides in relevant part:

*Capacity to Sue or be Sued.* The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile ... In all other cases, capacity to sue or be sued shall be determined by the law of the state in which the district court is held, ...

MBI argues that because Paloma is being sued in a representative capacity, Rule 17(b) requires that New York law be applied to determine her **capacity** to be sued in this Court. By its terms, however, Rule 17(b) mandates that this Court apply New York law only if Paloma is actually **acting** in a representative capacity. Paloma argues that, under French law, she does not have the authority to represent the Picasso Estate and cannot therefore act in a representative capacity. Thus, Rule 17(b) does not apply if Paloma does not have the *authority* to represent the Picasso Estate in litigation.

■ Support for the distinction between a party's capacity to sue or be sued or authority to sue or be sued is found in Fed.R.Civ.P. 9(a), which provides in relevant part:

(a) *Capacity.* It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party, except to the extent required to show the jurisdiction of the court....

Rule 9(a) speaks of three concepts: "capacity" to sue or be sued, "authority" to sue or be sued in a representative capacity and "legal existence" of an organized association.

The rule thus implies that each of the three are distinct concepts with different meanings. *See Roby v. Corporation of Lloyd's,* 796 F.Supp. 103, 110 (S.D.N.Y.1992) (Lasker, J.) (holding that Rule 9(a) makes it clear that legal existence and capacity to sue are distinct concepts), *aff'd,* 996 F.2d 1353 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Klinghoffer v. S.N.C. Achille Lauro,* 739 F.Supp. 854, 858, 865–66 (S.D.N.Y.1990) (treating issue of legal existence and capacity to sue separately), *vacated on other grounds,* 937 F.2d 44 (2d Cir. 1991). Similarly, I find that "capacity" and "authority" are distinct concepts. *See generally* Black's Law Dictionary 803, 121 (5th Ed.1979) (defining "capacity" as the ability of a particular individual or entity to use, or to be brought into, the courts of a forum, and "authority" as the permission or right to exercise power). Thus, Paloma's authority to act for or be sued as a representative of the *indivision* is not governed by Rule 17(b), which by its terms only applies to the "capacity" to be sued.

■ Paloma's authority to be sued as an heir is governed by French law, the law which created both the *indivision* and her status as an heir. Under French law, an *indivision* does not constitute a legal person and is a sui generis form of ownership that is distinct from a corporation, partnership, association, or joint ownership. Bermann Aff. at ¶¶ 10–11. In the absence of an administrator, acts of administration or disposition of the assets of an *indivision* require the consent of all of the heirs, and each heir may take all measures necessary for the preservation of the undivided property. *Id.* at ¶ 13 (citing French Civil Code (*Code civil*) Art. 815–3). However, after the appointment of an administrator, decisionmaking is centralized: only the administrator may act on behalf of the *indivision* to commercially exploit the property, and he is legally responsible for the faults he commits in his management of the property.[11] *Id.* at ¶¶ 13, 17. Most importantly, the administrator's authority to

---

11. The rationale for the appointment of an administrator is the existence of discord among the heirs. *See* Bermann Aff. at ¶ 13. Once an administrator is appointed, the indivision can speak with one voice, both as to internal relations among the individual heirs as well as to relations with third parties. *See* Bermann Reply Affidavit ("Bermann Reply Aff."), dated April 21, 1995, at ¶ 5.

administer the property includes being the sole representative of the *indivision* in any litigation, either as plaintiff or defendant, which arises out of the management or commercial exploitation of the property; conversely, the other heirs have no role in any litigation which relates to the administration of the property.[12]  *Id.* at ¶ 16.

MBI's expert attempted to controvert this conclusion by pointing to general principles of French law regarding a principal's liability for the acts of its agents. In his affidavit, MBI's expert stated that the Picasso heirs, as principals, are liable for the illegal acts of their agents, Claude and SPADEM. *See* Affidavit of Simon Abergel, dated May 5, 1995, at pp. 4–6. However, Paloma's expert convincingly testified that an heir does not stand in a principal/agent relationship with an administrator, and that in any event a more general provision of French law, such as principal/agent liability, must always yield to the more specific provision, such as the laws governing the *indivision.*  *See* Transcript at pp. 37–40.

Thus, the crucial issue in this case is whether the acts of Claude Picasso as Administrator and SPADEM as the Administrator's agent are acts of administration. If they are, the other heirs cannot be sued in their capacity as heirs for the acts of Claude and SPADEM which were taken in connection with the commercial exploitation of the Picasso reproduction rights. The Court finds that the complaint clearly relates to actions which are acts of administration: in all counts except Count Seven, Claude and/or SPADEM are alleged to have violated MBI's rights in connection with their attempts to exploit the reproduction rights in the Picasso images. For example, Count Four in the Second Amended Complaint alleges that defendants licensed or sold a broad range of products containing Picasso images which are virtually indistinguishable from MBI

products. Obviously, such conduct involves the commercial exploitation of the property of the *indivision.*

Nor does it matter that MBI claims that many of the acts taken by defendants occurred before Claude was appointed Administrator in 1989. Paloma's expert testified that the date of Claude's appointment is irrelevant because Claude is the sole representative of the *indivision* in litigation involving the reproduction rights, regardless of when the acts complained of took place. *See* Bermann Reply Aff. at ¶¶ 9–10. The Court accepts this conclusion because MBI's expert did not cite any law supporting his view that the date of appointment was relevant and because the view of Paloma's expert comports with the stated purpose of appointing an administrator: to enable the *indivision* to speak with one voice in order to safeguard the heirs' joint property. Indeed, it would undermine the purpose of an administrator if litigation could still be conducted by a multiplicity of heirs even after the administrator was appointed. *See* Transcript at pp. 21–22.

MBI also argues that it is unfair to dismiss Paloma from this case. This argument has no merit. First, Paloma is the only heir besides Claude who remains as a defendant, and MBI has proceeded in the absence of the other heirs. Moreover, any judgment against Claude Picasso as Administrator or SPADEM as Claude's agent will affect Paloma by proportionately diminishing her pro rata interest in the property of the *indivision.*[13]

Finally, the result would be the same even if this Court were to apply New York law. MBI argues that an *indivision* operates like a general partnership within the meaning of New York partnership law, and each heir should therefore be amenable to suit as a partner for the acts of the "partnership."

**12.** The administrator's only responsibility with respect to bringing the other heirs into a litigation is to list their names in the first responsive pleading. *See* Transcript of Argument, ("Transcript"), May 23, 1995, at p. 18.

**13.** According to Paloma's expert, all heirs share equally in the *indivision. See* Transcript at p. 47. If a judgment is rendered and collected against

the *indivision* prior to a division or *partage* of the property, each heir suffers a diminution of her proportionate interest. If the judgment is collected against the *indivision* after a *partage,* a creditor can make successive pro rata claims against each of the heirs to recover the judgment amount. *Id.* These liability rules do not change because a court appoints an administrator. *Id.*

This argument presents substantial problems. First, MBI's offers no support whatsoever for its assertion that an *indivision* should be analogized to a general partnership. Paloma's expert testified that under French law, an *indivision* does not constitute a legal person and is a sui generis form of ownership that is distinct from a corporation, partnership, association, or joint ownership. Bermann Aff. at ¶¶ 10–11. Thus, there is no basis to conclude that New York partnership law should govern Paloma's capacity to be sued. Similarly, there is no basis to find that an *indivision* is analagous to an estate under New York law.

Paloma argues that New York choice of law principles should be considered. This argument has some support in the case law. *See, e.g., General Heat & Power Co. v. Diversified Mortgage Investors,* 552 F.2d 556, 557 n. 1 (3d Cir.1977) (suggesting that Rule 17(b) encompasses the state's conflict of law rules); *Jacobs v. Adams,* 601 F.2d 176, 178–79 (5th Cir.1979) (applying conflict of law rules to determine scope of power or right to bring suit); *but see Tigert v. Lord, Bissell & Brook,* 1989 WL 44719 *1, 1989 U.S. Dist. Lexis 4427 *3 (D.D.C. April 28, 1989) (choosing not to apply conflict of law principles under Rule 17(b)).[14] Under New York choice of law principles, "the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation," controls. *Roby,* 796 F.Supp. at 107 (citing *Istim, Inc. v. Chemical Bank,* 78 N.Y.2d 342, 575 N.Y.S.2d 796, 581 N.E.2d 1042 (1991)). Because an *indivision* is a creation of French law, all of the heirs are French citizens, and Paloma is sued solely because of her status created under French law, French law governs.

Accordingly, under French law, Paloma Picasso is not authorized to be sued as an heir. She is therefore not amenable to suit for the acts of the kind alleged in the Second Amended Complaint, and her Motion to Dismiss is granted as to all counts except Count Seven.[15]

### B. *Tortious Interference with Contract*

In order to state a claim for tortious interference with contract under New York law, a plaintiff must allege four elements: i) the existence of a valid contract between the plaintiff and a third party; ii) defendant's knowledge of the contract; iii) defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible; and iv) damages to plaintiff. *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993) (citing *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)); *Enercomp, Inc. v. McCorhill Publishing, Inc.,* 873 F.2d 536 (2d Cir. 1989). MBI's proposed Count Seven clearly alleges the existence of valid contracts between it, Mitsukoshi and INFAS, Paloma's knowledge of those contracts, and damages to MBI. Proposed Count Seven at ¶¶ 183–84, 192. However, because of the somewhat conflicting statements of element three which exist in the case law, it is less clear if proposed Count Seven sufficiently establishes the third element of the tort.

A number of New York courts, as well as federal courts in New York which have had occasion to interpret New York law, have stated that the tort of intentional interference with contractual relations requires the plaintiff to allege and prove that the defendant induced or otherwise caused a third party to breach a contract with the plaintiff. *See, e.g., Benjamin Goldstein Productions, Ltd. v. Fish,* 603 N.Y.S.2d 849, 851, 198 A.D.2d 137 (1st Dep't.1993) (tortious interference with contract claim fatally flawed and academic where plaintiffs failed to show breach of the underlying contract by third parties); *NBT Bancorp v. Fleet/Norstar Financial Group,* 553 N.Y.S.2d 864, 868, 159 A.D.2d 902 (3d Dep't) *appeal dismissed,* 76 N.Y.2d 886, 561 N.Y.S.2d 546, 562 N.E.2d 871 (1990) (to plead a claim for intentional

---

**14.** I do note, however, that both *General Heat & Power* and *Jacobs* were diversity cases. Subject matter jurisdiction in the present case is based on federal question jurisdiction.

**15.** Of course, Claude Picasso as Administrator is amenable to suit under the above principles of French law.

interference with contractual relations, a pleader is required to allege a breach of the contract); *Universal City Studios v. Nintendo Co., Ltd.*, 797 F.2d 70 (2d Cir), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986) (tortious interference with contract claim requires plaintiff to establish that defendant induced a breach of the contract); *American Express v. Accu-Weather, Inc.*, 849 F.Supp. 233, 241 (S.D.N.Y. 1994) (same); *see generally* Restatement (Second) of Torts, § 766 (1979) (defining intentional interference with performance of contract as intentional and improper interference "with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract").[16]

In the present case, MBI does not allege that Paloma induced either Mitsukoshi or INFAS to breach their respective contracts with MBI. Rather, MBI terminated the contracts with Mitsukoshi and INFAS after Paloma's statements to Mitsukoshi and INFAS made the performance of the contracts "more difficult and lessened each party's enjoyment of the contract." *See* Proposed Count Seven at ¶¶ 185–187, 189–190. Because MBI does not allege that Paloma induced Mitsukoshi or INFAS to breach their respective contracts with MBI, MBI has not stated a claim in Count Seven for tortious interference with contract under the cases which require a plaintiff to allege a breach of the underlying contract by the third party.[17]

However, a number of other courts have held that a plaintiff does not have to allege a breach of the underlying contract in order to state a claim for tortious interference with contractual relations. *See, e.g., New York Yankees v. Sportschannel Associates*, 510 N.Y.S.2d 870, 872, 126 A.D.2d 470 (1st Dep't. 1987) (in order to make out a claim for tortious interference with contract, a plaintiff must prove defendant interfered with the performance of the contract without justification); *S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*, 489 N.Y.S.2d 478, 480–81, 108 A.D.2d 351 (1st Dep't.1985) (although plaintiff did not assert a breach of the underlying contract by the third party, complaint stated a claim for tortious interference with contract); *Maison Lazard v. Manfra, Tordella & Brooks, Inc.*, 585 F.Supp. 1286 (S.D.N.Y.1984) (citing *Goodall v. Columbia Ventures, Ltd.*, 374 F.Supp. 1324, 1332 (S.D.N.Y.1974) for the proposition that the tort of interference with contractual relations "extends to cases in which performance of the contract is rendered more difficult or a party's enjoyment of the contract's benefits is lessened by the wrongdoer's actions"); *Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100 (E.D.N.Y.1991) (elements of tortious interference with contract claim include defendant's unjustified and intentional interference with the contract).[18]

---

**16.** In addition, many courts have also required a plaintiff to allege that but for defendant's actions, the contract would not have been breached by the third party. *See, e.g., Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820 (2d Cir. 1990) (upholding dismissal of tortious interference claim where plaintiff failed to allege that defendant's actions were "but for" cause of third party's alleged breach of contract); *Demalco Ltd. v. Feltner*, 588 F.Supp. 1277 (S.D.N.Y.1984) (same). Obviously, MBI cannot plead that Paloma's action were the "but for" cause of INFAS and Mitsukoshi's breach of their contracts with MBI because MBI terminated its contracts with those companies.

**17.** While MBI did terminate the INFAS and Mitsukoshi contracts, MBI does not allege that its actions constituted a breach of those contracts. In any event, the cases which require a breach to be alleged hold that the third party, not the plaintiff, must breach the contract. *See, e.g., Benjamin Goldstein Productions, Ltd.*, 603 N.Y.S.2d at 849, 198 A.D.2d 137.

**18.** In an unpublished decision, Judge Knapp discussed this split in the case law and concluded that the tort of interference with contractual relations has evolved to embrace at least two different theories of tort: i) actual inducement of a third-party's breach; and ii) interference in some other way with the contract's performance. *Chemical Bank v. Bright Star Holding, Inc.*, 1995 WL 447792, * 5 (S.D.N.Y. June 8, 1989); *see also G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 910–11 n. 9 (S.D.N.Y. 1994) (Edelstein, J.) (noting that a division in the law exists over whether a breach of the underlying contract must be alleged in order to state a valid claim for intentional interference with contractual relations). Judge Knapp held that a breach of the underlying agreement did not have to be alleged in order to state a valid claim, and he distinguished cases which had held to the contrary by finding that the requirement of a breach was not necessary to the holdings in those cases. *Chemical Bank*, 1995 WL 447792 at * 5, 6 n. 5.

In its most recent pronouncement on the subject, the New York Court of Appeals stated that the "tort of inducement of breach of contract, now more broadly known as interference with contractual relations," requires a plaintiff to prove that the defendant intentionally induced the third party to breach or otherwise render performance impossible. *Kronos, Inc.*, 81 N.Y.2d at 94, 595 N.Y.S.2d 931. While the issue of breach was not central to its holding, *Kronos* suggests that, while an allegation of breach is not an absolute prerequisite for the tort, in most cases "improper intentional interference [will] generally [be] evidenced by a tortfeasor inducing ... a third party not to perform his contractual obligations to plaintiff." *Enercomp, Inc.*, 873 F.2d at 541 (citing *Guard Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980)). If the third party has not breached the contract, however, a plaintiff must allege that defendant's actions induced the third party to somehow render performance impossible.[19]

Under this standard, MBI's proposed Count Seven does not state a claim. MBI asserts that Paloma's statements made performance more difficult and lessened each party's enjoyment of the contracts; however, lessening each party's enjoyment is not an allegation that Mitsukoshi or INFAS rendered performance impossible or even that the contracts became commercially impracticable. Moreover, the fact that Mitsukoshi and INFAS "lost faith in MBI and sought continuous reassurance" and "Mitsukoshi was forced to fly two million dollars of its

prototypes to New York for a product review" is not burdensome enough to constitute improper interference. Neither company felt compelled to terminate the contracts, inform MBI that termination was being considered, or prevent any future performance under the contracts. Nor does MBI claim that Paloma's statements made it impossible for it to perform; indeed, MBI simply claims that the Mitsukoshi and INFAS contracts became "very expensive" to maintain and does not allege that its performance was substantially prevented. In sum, accepting all of MBI's allegations as true and construing all reasonable inferences in its favor, these allegations do not rise to the level of interference necessary to constitute tortious interference with contract. Accordingly, Paloma's Motion to Dismiss Count Seven is granted.[20]

## CONCLUSION

For the reasons stated above, Paloma Picasso's Motion to Dismiss is granted.

SO ORDERED.

**19.** At the very least, defendant's improper interference must be severe enough to make the contract impossible to perform—even if the third party is not at fault for this result. Such a definition of the third element of the tort would help to explain the holding of some of the cases which did not require an allegation of breach. For example, in *S & S Hotel Ventures Ltd. Partnership*, 489 N.Y.S.2d at 479–81, 108 A.D.2d 351, the plaintiff borrowed money from the defendant in order to make improvements on plaintiff's hotel. As part of the loan agreement, plaintiff promised to obtain defendant's consent if it desired to sell the hotel, and defendant promised not to unreasonably withhold consent to any proposed sale. After plaintiff contracted to sell the hotel to a third party, the defendant unreasonably withheld consent to the sale and prevent-

ed the contract's performance. Although the third party had not breached the sale contract, the court held that plaintiff had stated a claim for tortious interference with contract because the defendant's actions had prevented the performance of the sale contract. *Id.* at 480, 108 A.D.2d 351.

**20.** By contrast, ¶ 191 of proposed Count Seven alleges that "[t]he actions of SPADEM and Claude Picasso have caused Japanese companies to cancel their agreements with MBI, terminating longstanding business relations MBI had with the Hakone Open Air Museum in Japan, Isetan, and Spanish Village." Proposed Count Seven therefore states a claim against SPADEM and Claude Picasso.