# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SILVER MANAGEMENT GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2018-0421-KSJM |
| ADVISORENGINE INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Dated Submitted:  December 18, 2018
Date Decided: March 18, 2019

Raymond J. DiCamillo, Jeffrey L. Moyer, Nicole K. Pedi, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Plaintiff Silver Management Group, Inc.*

David J. Teklits, Coleen W. Hill, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Gene W. Lee, PERKINS COIE LLP, New York, New York; *Attorneys for Defendant AdvisorEngine Inc.*

**McCORMICK, V.C.**

In 2014, AdvisorEngine Inc. ("AdvisorEngine") retained Silver Management Group, Inc. ("Silver") to develop backend software to power AdvisorEngine's then-planned wealth-management platform. In 2015, after the platform went live, the parties entered into agreements granting AdvisorEngine the right to license Silver's software for a seven-year term. The agreements required AdvisorEngine to pay a monthly license fee. The fee amount was a percentage of gross revenue derived from sales of the suite of software products sold on AdvisorEngine's wealth-management platform. In December 2017, AdvisorEngine acquired a new software product. That product was advertised and sold as part of a "unified" system with AdvisorEngine's suite of software products. Silver demanded that fees generated from the sales of the new software product be included in the gross revenues used to calculate Silver's monthly license fee. AdvisorEngine refused.

Meanwhile, in October 2016, Silver's lead software developer accepted a position working for AdvisorEngine. By May 2018, AdvisorEngine had created a replacement for Silver's backend software. AdvisorEngine, however, was only permitted to terminate the licensing agreements before the seven-year term expired if Silver materially breached the agreements. Opportunistically, AdvisorEngine took the position that Silver's dispute concerning the license fee calculation constituted a material breach, purported to terminate the agreements on this basis, and ceased using Silver's software. This lawsuit ensued.

1

Silver asserts six causes of action, and AdvisorEngine asserts two counterclaims. The parties cross-moved for partial summary judgment on five of the eight total claims. AdvisorEngine is entitled to summary judgment on Count I, which concerns the calculation of Silver's license fee. The plain language of the licensing agreement does not entitle Silver to fees derived from revenues generated by the newly acquired software product. Silver prevails the parties' claims concerning whether AdvisorEngine remains obligated under the agreements. Silver's motion on Count VI is granted—AdvisorEngine's written termination was ineffective because merely disputing the terms of the licensing agreement did not constitute a material breach. AdvisorEngine's motion on Counterclaim II is denied—AdvisorEngine's unilateral decision to cease using Silver's software did not end AdvisorEngine's obligation to pay license fees under the plain language of the licensing agreements.

The remaining claims turn on factual questions unsuited for summary judgment. Through Count II, Silver seeks to enforce contractual rights to information. Through Count IV, Silver contends that AdvisorEngine breached non-solicitation provisions of the licensing agreements by employing Silver's software developer. The record before the Court is limited. The parties have not produced documents or taken depositions. To resolve the inherently factual issues raised in Counts II and IV, further development of the record is desirable.

## I.   BACKGROUND

The facts are drawn from the materials presented in support of the parties' cross motions for summary judgment.

### A.   The Agreements

AdvisorEngine was formed to develop and provide a wealth management platform to third-party financial advisors and their clients.[1]   In early 2014, AdvisorEngine's corporate predecessor, Vanare LLC ("Vanare"), retained Silver to code the backend software for AdvisorEngine's planned wealth management platform.[2]   The initial version of this software went live in August 2014.[3]

On July 16, 2015, the parties entered into a Master Agreement back-dated to have an effective date of March 1, 2014.[4]   Also on July 16, 2015, the parties entered into Schedule #3, which incorporates the terms and conditions of the Master Agreement and has an effective date of March 1, 2014.[5]   The Master Agreement and Schedule #3 (the "Agreements") granted to Vanare the right to license Silver's software.[6]

---

[1] C.A. No. 2018-0421-KSJM Docket ("Dkt.") 36, Aff. of Richard Cancro ("Cancro 9/28/18 Aff.") ¶ 3.

[2] *Id.* ¶ 7.

[3] *Id.* ¶ 9.

[4] *See* Dkt. 1, Silver's Verified Compl. ("Compl.") Ex. 1 ("Master Agr.").

[5] *See* Compl. Ex. 2 ("Schedule #3").

[6] *Id.*

## A. The License Fee Dispute

The Agreements require AdvisorEngine to pay monthly license fees for Silver's software. Fees paid to Silver are to be based on a percentage of the gross fees AdvisorEngine charges its customers for "Vanare Platform Services," subject to monthly minimums and maximums.[7] The Master Agreement defines "Vanare Platform Services" as "the wealth management platform and related technology and business operations services of Vanare and its wholly-owned subsidiary, NestEgg Wealth, Inc."[8]

### 1. The parties dispute the basis for calculating Silver's license fee.

In December 2017, AdvisorEngine acquired a company called CRM Software Inc., which does business as "Junxure," and which provides customer relationship management software to financial advisors.[9] Junxure software has generated significant fees for AdvisorEngine, Silver says.[10]

Silver argues that the Junxure software is part of the Vanare Platform Services.[11] Silver contends that public disclosures made by AdvisorEngine reveal

---

[7] Schedule #3 Ex. A § 2.a.

[8] Master Agr. § 1.2.

[9] Cancro 9/28/18 Aff. ¶ 10.

[10] Compl. ¶ 43; Dkt. 38, Aff. of Nichole K. Pedi ("Pedi 10/2/18 Aff.") Ex. H.

[11] Compl. ¶ 55; Pedi 10/2/18 Aff. Ex. H.

that Junxure operates as part of a "unified" platform of "related" platform of software.[12]

AdvisorEngine did not include fees from the Junxure software in the gross fees used to calculate Silver's monthly license fee.[13] The gross fees AdvisorEngine used to generate Silver's monthly license fee declined from $91,879 for July of 2015 to $37,164 for January of 2018.[14] The monthly license fees paid to Silver reduced proportionately.

### 2. Silver demands information from AdvisorEngine concerning the fee dispute.

On February 16, 2018, Silver requested client billing data and financial statements from AdvisorEngine.[15] Silver's stated purpose for the information was to invoice AdvisorEngine for the January 2018 period.[16] As part of this request,

---

[12] Specifically, public disclosures describe the Junxure acquisition as part of an "end-to-end" wealth management platform for financial advisors, Pedi 10/2/2018 Aff. Ex. D at 72, and as a "unified" wealth management platform for the wealth advisor customers of the "combined" and "integrated" businesses of AdvisorEngine and Junxure, *id.* Ex. E. On its webpage, AdvisorEngine describes the "combination" between Junxure and AdvisorEngine as: "[t]wo industry innovators. *One smart platform.*" Dkt. 39, Aff. of Blake Henry ("Henry 10/2/18 Aff.") Ex. 4 (alteration and emphasis added). AdvisorEngine disputes that Junxure software is part of an "end-to-end" solution with Silver's software. Dkt. 36, Opening Br. in Supp. of Def. AdvisorEngine Inc.'s Mot. for Partial Summ. J. ("Def.'s Opening Br.") at 10.

[13] Pedi 10/2/18 Aff. Exs. G–J.

[14] Henry 10/2/18 Aff. ¶ 3.

[15] Pedi 10/2/18 Aff. Ex. G.

[16] *Id.*

5

Silver sought Junxure client billing information.[17] AdvisorEngine denied Silver's request on February 28, 2018, stating that Silver is not entitled to licensing fees related to Junxure revenue.[18]

On March 13, 2018, Silver initiated the dispute resolution process set forth in the Master Agreement.[19] The parties exchanged further communications and met in person but failed to resolve their disputes.[20] The contractually-mandated dispute resolution period ended after sixty days in May 2018.[21]

### 3. AdvisorEngine purports to terminate the Agreements based on Silver's demands concerning the fee calculation.

In a May 14, 2018 letter, AdvisorEngine terminated the Agreements for cause effective July 13, 2018.[22] As "cause," AdvisorEngine cited Silver's demands that AdvisorEngine include fees generated from Junxure software when calculating Silver's licensing fees.[23] Silver disputes that the May 14, 2018 letter was effective in terminating the Agreements.

---

[17] *Id.*

[18] *Id.*

[19] *Id.* at Ex. H; Master Agr. § 15.1.

[20] *See* Dkt. 49, Opp'n Aff. of Richard Cancro ("Cancro 10/26/18 Aff.") ¶¶ 15–16; Henry 10/2/18 Aff. ¶¶ 6–8; Dkt. 59, Aff. of Blake Henry ("Henry 11/9/18 Aff.") ¶ 10; Pedi 10/2/18 Aff. Ex. I–J.

[21] Master Agr. § 15.1.

[22] Pedi 10/2/18 Aff. Ex. K.

[23] *Id.*

## B. The Non-Solicitation Dispute

The Master Agreement prohibits the parties from soliciting each other's employees without prior written consent.[24] Patrick Arnold was Silver's lead software developer when Silver developed AdvisorEngine's wealth management software.[25] In January 2016, Arnold and AdvisorEngine's CEO discussed Arnold's desire to leave Silver.[26] Later, they met several times to discuss opportunities for Arnold at AdvisorEngine.[27] In October 2016, Arnold resigned from Silver and started working for AdvisorEngine.[28] In 2017, AdvisorEngine began developing software to replace the Silver backend software.[29] AdvisorEngine alleges that it began developing its own backend software "long before hiring Patrick Arnold, and AdvisorEngine has not used any of Silver's confidential information in developing its own backend software."[30]

---

[24] Master Agr. § 17.16.

[25] Cancro 9/28/2018 Aff. ¶ 14; Dkt. 36, Aff. of Patrick Arnold ("Arnold Aff.") ¶¶ 4–5.

[26] Cancro 9/28/2018 Aff. ¶ 15; Arnold Aff. ¶ 7.

[27] Cancro 9/28/2018 Aff. ¶ 16; Arnold Aff. ¶ 7.

[28] Cancro 9/28/2018 Aff. ¶ 16; Arnold Aff. ¶ 8.

[29] Cancro 9/28/2018 Aff. ¶ 13.

[30] Dkt. 61, Aff. of Richard Cancro ("Cancro 11/9/2018 Aff.") ¶ 6.

AdvisorEngine has represented that it ceased using Silver's software and started using the replacement software in July 2018.[31]  Silver disputes this fact.[32]

## C.    The Litigation

Silver commenced this litigation on June 8, 2018.[33]  The Verified Complaint asserts six causes of action.[34]  The first five claims assert that AdvisorEngine breached the Agreements by failing to pay Silver appropriate license fees (Count I);[35] refusing to provide Silver customer billing data (Count II);[36] misusing Silver's confidential information and reverse-engineering Silver's licensed software (Count III);[37] soliciting Arnold in breach of the non-solicitation provision (Count IV);[38] and exceeding the scope of use of Silver's software license (Count V).[39]  Additionally, Silver seeks a declaration that AdvisorEngine's termination was ineffective (Count VI).[40]

---

[31] Cancro 9/28/18 Aff. ¶ 13.

[32] Henry 10/2/18 Aff. ¶ 12.

[33] Dkt. 1.

[34] Compl. ¶¶ 50–141.

[35] *Id*. ¶¶ 50–66.

[36] *Id*. ¶¶ 67–83.

[37] *Id*. ¶¶ 84–100.

[38] *Id*. ¶¶ 101–112.

[39] *Id*. ¶¶ 113–123.

[40] *Id*. ¶¶ 124–141.

On September 11, 2018, AdvisorEngine answered and asserted two counterclaims.[41] Counterclaim I seeks a declaration that Silver breached the Agreements by failing to provide software that meets industry standards.[42] Counterclaim II seeks a declaration that AdvisorEngine's obligation to pay license fees ceased in July 2018, when AdvisorEngine stopped using Silver's software.[43]

## II. ANALYSIS

Silver has moved for summary judgment on Silver's Counts I, II, and VI.[44] AdvisorEngine has moved for summary judgment on Silver's Counts I and IV and AdvisorEngine's Counterclaim II.[45] The motions collectively seek resolution of Silver's Counts I, II, IV and VI, and AdvisorEngine's Counterclaim II.

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[46] "[T]he court must view the evidence in the light most favorable to the non-moving party."[47] "Any application

---

[41] Dkt. 30, Def. AdvisorEngine's Answer and Countercls.

[42] *Id.* ¶¶ 5–10 at pp. 45–47.

[43] *Id.* ¶¶ 11–13.

[44] Dkt. 33; Dkt. 34, Pl. Silver Mgmt. Gp., Inc.'s Opening Br. in Supp. of Its Mot. for Partial Summ. J. ("Pl.'s Opening Br.").

[45] Dkt. 35; Dkt. 36, Opening Br. in Supp. of Def. AdvisorEngine Inc.'s Mot. for Partial Summ. J. ("Def.'s Opening Br.") at 1.

[46] Ct. Ch. R. 56(c).

[47] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992) (citation omitted).

for such a judgment must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom."[48]

"There is no 'right' to a summary judgment."[49] When confronted with a Rule 56 motion, the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application.[50]

---

[48] *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

[49] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (quoting *Anglin v. Bergold*, 565 A.2d 279 (Del. 1989)).

[50] *See Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002) (reversing summary judgment holding where there was a triable issue of material fact and commenting that "the trial court may . . . deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.") (citation omitted); *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918–19 (Del. 1965) (holding that in denying the defendant's motion for summary judgment, the trial court "needed no more reason than to conclude, upon preliminary examinations of the facts, that it found it desirable to inquire thoroughly into all of the facts in order to clarify the application of the law"); *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962) (reversing summary judgment holding where a genuine issue of disputed fact remained unresolved and observing that summary judgment will not be granted "if, upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances") (citation omitted); *In re Comverge, Inc. S'holders Litig.*, C.A. No. 7368-VCMR, at 10 ¶ 11 (Del. Ch. Oct. 31, 2016) (ORDER) (denying summary judgment where "fuller development of the facts should serve to clarify the law or help the Court determine its application to the case").

## A. The License Fee Dispute

### 1. Silver's Count I

Silver's Count I claims that AdvisorEngine breached the Agreements by failing to include fees from the Junxure software when calculating Silver's monthly licensing fee.[51] Silver and AdvisorEngine cross-move for summary judgment on this Count, each arguing that the Agreements' plain and unambiguous meaning resolves in their favor.[52]

New York law governs this analysis under the Master Agreement's choice of law provision.[53] "In interpreting contract language, New York contract law instructs courts ordinarily to give the words and phrases employed their plain and commonly-accepted meanings."[54] "If the contract is capable of only one reasonable interpretation, *i.e.*, is unambiguous," then the courts will "give effect to the contract as written."[55] "Where the language is free from ambiguity, its meaning may be

---

[51] Compl. ¶¶ 54–66.

[52] Def.'s Opening Br. at 15–17.

[53] *See, e.g.*, Master Agr. § 15.4; *Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260, 265 n.* (1977) ("As a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored"); Restatement (Second) of Conflict of Laws § 187 (1971).

[54] *Bank of New York Mellon v. Realogy Corp*, 979 A.2d 1113, 1121 (Del. Ch. 2008).

[55] *See VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 129 (2d Cir. 2001) (alteration omitted) (quoting *K. Bell & Assoc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)).

determined as a matter of law on the basis of the writing alone without resort to extrinsic evidence."[56]

Two provisions of the Agreements bear on Count I: Section 2.a of exhibit A to Schedule #3, which sets forth the license fee payment obligations,[57] and Section 1.2 of the Master Agreement, which defines "Vanare Platform Services."[58]

Section 2.a requires that AdvisorEngine calculate Silver's license fees as follows: "The Monthly license fees for the Licensed Software shall be twelve percent (12%) of the gross fees . . . charged by Vanare to its customers *for Vanare Platform Services* . . ., subject to a monthly maximum of $250,000.00 and [certain monthly minimums]."[59]

Section 1.2 defines Vanare Platform Services as "the wealth management platform and related technology and business operations services of Vanare and its wholly-owned subsidiary, NestEgg Wealth, Inc."[60]

Silver argues that the Junxure software falls within the definition of Vanare Platform Services because it is a "related technology" of the "wealth management

---

[56] *Realogy Corp*, 979 A.2d at 1121 (alteration omitted) (quoting *Master–Built Constr. Co. v. Thorne*, 802 N.Y.S.2d 713, 714 (2005)).

[57] Schedule #3 Ex. A § 2.a.

[58] Master Agr. § 1.2.

[59] Schedule #3 Ex. A § 2.a (emphasis added).

[60] Master Agr. § 1.2.

platform."[61]  Silver contends that the definition of Vanare Platform Services extends to all technologies "related" to Vanare's wealth-management platform.[62]  But the subordinate clause ending Section 1.2, "**of** Vanare and its wholly-owned subsidiary, NestEgg Wealth, Inc.," modifies the immediately preceding phrase, "related technology and business operations services."[63]  Therefore, under the plain language of Section 1.2, a "related technology" must be "of Vanare" to qualify as a Vanare Platform Service.[64]

"[O]f Vanare" does not include Junxure software for three reasons.  First, the phrase "its wholly-owned subsidiary, NestEgg Wealth, Inc." would be unnecessary and superfluous if the phrase "of Vanare" by itself included all Vanare wholly-owned subsidiaries.[65]  Superfluous contractual language is to be avoided under New York law, where "longstanding principles of contract interpretation requi[re] courts to give effect to every term[.]"[66]  Next, under the canon that the expression of one

---

[61] *See* Dkt. 46, Pl. Silver Mgmt. Gp., Inc.'s Answering Br. in Opp'n to AdvisorEngine Inc.'s Mot. for Partial Summ. J. ("Pl.'s Ans. Br.") at 12–15, 20.

[62] Pl.'s Opening Br. at 14–15.

[63] Master Agr. § 1.2 (emphasis added).

[64] *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 147–48 (2d Cir. 2004) (applying New York law and holding that "[a]bsent some contrary indication," a contractual phrase "refers to the nearest preceding referent") (alteration omitted).

[65] Dkt. 60, Reply Br. in Supp. of Def. AdvisorEngine's Mot. for Partial Summ. J. ("Def.'s Reply Br.") at 6.

[66] *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 695 (S.D.N.Y. 2017).

thing implies the exclusion of the other,[67] the specific inclusion NestEgg Wealth, Inc. should be interpreted to exclude other AdvisorEngine subsidiaries.[68] Finally, "[a]bsent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties," New York courts will deem a contract to exclude obligations of future affiliates.[69] By analogy, if the sophisticated parties to the Agreements intended to base license fees on future affiliates' gross revenues, they would have done so expressly.[70]

For these reasons, the language "of Vanare and its wholly-owned subsidiary NestEgg Wealth, Inc." does not include later-acquired, wholly-owned subsidiaries, such as Junxure. Fees generated from the Junxure software, therefore, are not included in the gross fees used to calculate Silver's license fee under Section 2.a.

### 2. Silver's Count II

Silver moves for summary judgment on Count II, which seeks to compel AdvisorEngine to provide categories of client billing information, including Junxure client billing data. Silver bases Count II on Sections 11.1 and 5.6 of the Master Agreement.

---

[67] *See VKK Corp.*, 244 F.3d at 130 (applying *expressio unius est exclusio alterius* canon).

[68] Def.'s Reply Br. at 6.

[69] *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 246 (2014) (citing *VKK Corp.*, 244 F.3d at 130–31).

[70] Def.'s Reply Br. at 7–8.

Silver is not entitled to the client billing information under Section 11.1 of the Master Agreement governing "Confidential Information."[71] Section 11.1 does not affirmatively require the parties to share information. Rather, it governs what confidentiality protections the parties must afford information after receipt.

It is unclear based on the record before the Court whether Silver is entitled to any relief under Section 5.6. That section provides: "In the event of a good faith dispute with regard to one or more item(s) appearing on an invoice, Vanare shall notify Silver promptly after receipt of the invoice *with reasonable detail as to the nature of the dispute . . . .*"[72] If Silver seeks through Count II Junxure billing only as AdvisorEngine contends, then Silver's request is denied based on the Court's ruling on Count I. But it is neither clear nor undisputed what information Silver seeks. Further development of the factual record on this issue is desirable.[73]

### 3. Silver's Count VI

Silver moves for summary judgment on its Count VI, which seeks a declaration that AdvisorEngine's termination was ineffective under Section 16.2 of

---

[71] Master Agr. § 11.1 ("Confidential Information. Each party has made and will continue to make available to the other party information that is not generally known to the public and at the time of disclosure is identified as, or would reasonably understood by the receiving party to be, proprietary or confidential ("Confidential Information"). Confidential Information may be disclosed in oral, written, visual, electronic or other form. Vanare's confidential Information includes without limitation [(a)–(g) omitted for brevity].").

[72] *Id*. § 5.6 (emphasis added).

[73] *See supra* note 50.

the Master Agreement. Section 16.2 permits AdvisorEngine to terminate the Agreements if Silver "materially breache[d] its obligations" under the Agreements.[74]

AdvisorEngine argues that Silver materially breached the Agreements by violating the implied covenant of good faith and fair dealing.[75] Under New York Law, the implied covenant

> is breached when a party acts in a manner that although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under the agreement. The implied covenant protects the reasonable expectations of each party that arises from the agreement it entered into[.][76]

"A material breach is a breach that is so substantial it defeats the purpose of the *entire* transaction."[77]

AdvisorEngine argues that Silver breached the implied covenant by making "continuing demands that AdvisorEngine pay license fees to Silver based on . . . revenue from Junxure's . . . software."[78] AdvisorEngine does not attempt to argue that these alleged breaches defeated any purpose of the Agreements, much less the

---

[74] Master Agr. § 16.2(a) (emphasis added).

[75] Def.'s Ans. Br. at 24–26.

[76] Glen Banks, *New York Contract Law* § 17:8 at 627 (2006) (citations and footnote omitted).

[77] *Id.* § 17:10 at 632 (emphasis added) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976), *In re Bradlees Stores, Inc.*, 2001 WL 1112308, at *7 (S.D.N.Y. 2001)).

[78] Pedi 10/2/18 Aff. Ex. K.

entire transaction.[79]  Having failed to brief the issue, AdvisorEngine waived its ability to do so.[80]  Therefore, Silver is entitled to summary judgment to Count VI.

### 4.    AdvisorEngine's Counterclaim II

AdvisorEngine moves for summary judgment on its Counterclaim II, which seeks a declaration that "the license fees are predicated on the use of Silver's backend software."[81]  According to AdvisorEngine, because it ceased using Silver's software in July 2018, it no longer owes monthly license fees.[82]

AdvisorEngine's argument finds no support in the Agreements.  The Agreements base Silver's monthly license fees on a percentage of the gross fees charged for Vanare Platform Services and subject to monthly minimums and maximums—not on AdvisorEngine's use of Silver's software.[83]  The Agreements remain in effect until they expire or the parties terminate pursuant to Section 16 of

---

[79] AdvisorEngine uses the word "material" only once in its Answering Brief, and in conclusory manner.  Def.'s Ans. Br. at 26 ("Silver's material breach of its obligation to act in good faith proved a basis for AdvisorEngine's termination of the Agreements.").

[80] *Pine River Master Fund Ltd. v. Amur Fin. Co., Inc.*, 2017 WL 4023099, at *10 n.76 (Del. Ch. Sept. 13, 2017) (citing *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2008), *aff'd*, 840 A.2d 641 (Del. 2003)) (granting summary judgment and injunctive relief in breach of contract claim where defendant failed to address plaintiff's request for injunctive relief in its initial opposition to plaintiff's motion for summary judgment).

[81] Def.'s Opening Br. at 24 (emphasis omitted).

[82] *Id*. at 25.

[83] Schedule #3 Ex. A § 2.a.

the Master Agreement[84]—not until AdvisorEngine unilaterally determines to cease using Silver's software. The Court cannot rewrite the Agreements to impose a "use" condition on license fee payments. Accordingly, AdvisorEngine's motion as to its Counter Claim II is denied.

### B. The Non-Solicitation Dispute

AdvisorEngine moves for summary judgment on Silver's Count IV, which claims that AdvisorEngine breached the Master Agreement's non-solicitation provision by soliciting Arnold's employment. The non-solicitation provision prohibits AdvisorEngine from "solicit[ing] for employment employees or contractors of [Silver] that were involved in the performance of the Services hereunder . . . unless the other party provides prior written consent."[85]

AdvisorEngine argues that "New York law is clear: for a person to solicit a potential employee, that person *must initiate* contact with the employee."[86] Arnold, not AdvisorEngine, initiated contact between them, according to AdvisorEngine.[87]

---

[84] Master Agr. § 16.1.

[85] *Id.* § 17.16.

[86] Def.'s Opening Br. at 21–23 (emphasis added) (citing *Forum Pers., Inc. v. David J. Greene & Co., LLC*, 2002 WL 424344, at *1 (N.Y. App. Div. Mar. 14, 2002), *NBT Bancorp v. Fleet/Norstar Fin. Gp.*, 159 A.D.2d 902, 903 (N.Y. App. Div. 1990), and *Bajan Gp., Inc. v. Consumers Interstate Corp.*, 2010 WL 3341456, at *6 (N.Y. Sup. Ct. 2010) (TABLE)).

[87] Cancro 9/28/18 Aff. ¶ 15 ("In early 2016, Mr. Arnold set up a meeting with me. He informed me that he was not happy working at Silver and that he was going to leave Silver. Further, he said he was interested in potentially working with AdvisorEngine. I did not mention or suggest AdvisorEngine as a potential opportunity for Mr. Arnold until after he first raised the possibility of working with AdvisorEngine."); Arnold Aff. ¶ 7 ("In or about

AdvisorEngine's CEO, Richard Cancro, avers that "[i]n early 2016, Mr. Arnold set up a meeting with me. He informed me that he was not happy working at Silver and that he was going to leave Silver."[88] Cancro admits that Arnold did not leave Silver to work for AdvisorEngine for approximately ten months thereafter.[89] Cancro further admits that during that period Cancro and Arnold "met several times . . . to discuss opportunities in the market in general and possibly with AdvisorEngine."[90] Still, AdvisorEngine argues that because Arnold initiated the early 2016 meeting, nothing AdvisorEngine did at that meeting or thereafter could have breached the non-solicitation provision as a matter of law.

Silver contends that New York law does not clearly require that a person *must initiate* contact with the employee to breach a non-solicitation provision. Silver cites to one federal decision applying New York law and holding that merely *encouraging* an employee to leave his employer supports breach of a non-solicitation provision.[91]

---

January 2016, I set up a meeting with Mr. Cancro to inform him that I wanted to leave Silver and that I was looking for a new position, including possibly to work with AdvisorEngine.").

[88] Cancro 9/28/18 Aff. ¶ 15.

[89] *Id.* ¶ 16

[90] *Id.*; *see also* Arnold Aff. ¶ 7 ("Mr. Cancro and I met a number of times over the following months to discuss new opportunities, both in the market at large and with AdvisorEngine because it was positioned for growth, and I had come to understand its business model.").

[91] Pl.'s Ans. Br. at 31–32 (citing *Oliver Wyman*, 282 F. Supp. 3d at 696).

Further development of New York law on this issue is desirable. Additionally, even if New York law is as AdvisorEngine contends, a fuller factual record should serve to clarify the law's application to this action. AdvisorEngine's evidence comes in the form of affidavits only; Silver has not obtained documents or taken depositions to test AdvisorEngine's assertions. It is desirable at this stage to allow the parties to develop the factual record concerning Count IV.[92]

## III.    CONCLUSION

For the foregoing reasons, summary judgment is GRANTED on Silver's Count I in favor of AdvisorEngine and on Silver's Count VI in favor of Silver. Summary judgment is DENIED on Silver's Count II, Silver's Count IV, and AdvisorEngine's Counterclaim II.

---

[92] *See supra* note 50.